ISRAEL P. BROWN *v.* ALBERTUS EDSON AND THE TOWN OF PLYMOUTH.

[Same Case, 22 Vt. 357.]

*Registry in New Hampshire of ancient deeds of land in this state. Presumption of regularity. Authentication of office copy of deed from another state. Case overruled. Power of administrator in another state to deed land in this state. Estoppel by deed. Presumption of deed. Acquiescence in division line.*

The registry of a deed in Exeter, New Hampshire, conveying land within what is now the state of Vermont, and executed and recorded previous to the organization of this state, and while the territory was claimed by the inhabitants to belong to the province of New Hampshire, that province in fact maintaining the actual government over the territory, is sufficient.

The court will always incline to give effect to such ancient proceedings, if possible, upon the ground that the very fact of their having been taken raises some presumption in their favor, that, at the time, they were regarded as valid; and, unless the court can perceive some sure ground, upon which their insufficiency rests, it ought to be presumed, that some law then existed, by which the proceeding was justified, and which has escaped the investigation of the court, through the obscurity which lapse of time always induces.

But if the party produce an office copy of such registry, it must be authenticated according to the provisions of the act of Congress upon this subject.

The case of *Ingersol* v. *Van Guilder*, 1 D. Ch. 59, where it is said, that a judgment of a justice of the peace need not be authenticated in conformity to the act of congress, and that it is only *prima facie* evidence of the debt, has not been regarded as law, upon either point, for many years.

But the registry of a deed in Cheshire county, New Hampshire, in February, 1781, which deed conveyed land in Plymouth, in what is now Windsor county, in this state, was held insufficient, for the reason, that this state was fully organized as early as 1777, and although there was then no town clerk's office in Plymouth, or any adjoining town, and Windsor county, although constituted previous to the registry of the deed, contained no clerk or office for records, yet Cumberland county, embracing what is now Windsor county, was fully organized, with a clerk and books of registry, as early as 1779, and the deed should have been there recorded.

Brown *v.* Edson et al.

An administrator cannot, by virtue of a letter of administration and order of sale obtained in another state, convey land of his intestate situated in this state.

But if one, who has the legal title to land in this state, execute a deed, purporting to convey the land, he is estopped to deny, that the title thereby passes, although he profess to execute the deed as administrator of some one else possessing no title, and of whose estate he has no legal administration.

It can never be presumed, that a deed of land was anciently executed and has been since lost, except for the purpose of quieting a long continued possession of the land. And if the premises conveyed by such deed, if any deed existed, consisted of the undivided right of a proprietor of a township granted under a New Hampshire charter, it is not sufficient, for the purpose of laying the foundation for presuming the existence of such a deed, to show, that the party, to whom it must be presumed such deed, if any, was executed, and his grantees have on record subsequent deeds of such undivided right, and were recognized, by the other proprietors, as the proprietors of such right.

The mere acquiescence in a line, as a dividing line, between adjoining proprietors for fifteen years, although but one of the proprietors, and perhaps neither, is in actual possession, is sufficient to establish that line, as the true line of division, if known and claimed by both proprietors.

The plaintiff's grantor entered into possession of a tract of land in Plymouth, in 1792, under a survey bill; but the defendants, who claimed a tract of land, which in the division of the town in 1796, was allotted as the right of the first settled minister, next south of and adjoining the tract in question, gave evidence tending to prove, that the plaintiff's grantor, who so entered into possession, and those who owned and possessed the land under him, down to and including the plaintiff, and as late as 1840, had from time to time, on various occasions, and to divers persons, pointed out a line, north of the true southerly line of the pitch, as found by the jury, as being the true southerly line, and uniformly claimed and possessed only to that line; and it was held, that this acquiescence, if found by the jury, must be sufficient to establish the line, so claimed to, as the true line, notwithstanding it appeared, that no actual possession was taken of any part of the minister right, either by the first settled minister, or by or under the town, until 1842,—which was but three or four years previous to the commencement of this suit.

EJECTMENT for land in Plymouth. Plea, the general issue, and trial by jury, December Term, 1850,—COLLAMER, J., presiding.

The plaintiff claimed title to the land, described in his declaration, as part of the right of John Grimes, who was one of the original proprietors under the charter of Plymouth, then called Saltash, granted by Benning Wentworth, governor of the province of New

Hampshire. No question was made in reference to any of the deeds, by which the title was transmitted from Grimes to the plaintiff, excepting as follows.

The plaintiff offered in evidence an office copy of a deed from John Grimes to Josiah Willard, dated July 15, 1765, recorded at Exeter, New Hampshire, July 18, 1765, and purporting to convey the right of Grimes under the charter above mentioned. This was certified to be a true copy of record by Josiah B. Wiggin, register of deeds for the county of Rockingham, New Hampshire, in whose office the original record remained, under date of November 8, 1850; and a certificate was annexed, signed by the clerk of the court of common pleas for the county of Rockingham, under the seal of said court, that Josiah B. Wiggins was register of deeds for said county, and by law the keeper of the records in the registry of deeds of said county, and the proper officer to make and certify copies thereof, and that his genuine signature was attached to his certificate, above mentioned. To the admission of this evidence the defendants objected; but the objection was overruled by the court. The plaintiff also offered in evidence an office copy of a deed from Josiah Willard to David Baldwin, dated February 21, 1781, recorded at Keene, in the county of Cheshire and State of New Hampshire, May 25, 1781, purporting to convey the right of Grimes under the charter above mentioned, and certified by the present register of deeds and clerk of the court of common pleas for the county of Cheshire, in the same manner with the deed from Grimes to Willard, above mentioned. To this evidence the defendants also objected; but the objection was overruled by the court. It appeared, that there were no county records in Windsor county, in this state, in which Plymouth is situated, of an earlier date than 1782, and no county clerk.

The plaintiff also offered in evidence an office copy, from the records of Plymouth, of a deed from David Baldwin, administrator of Thomas Kennall, to Jonathan Wilder, dated April 24, 1786, and recorded April 7, 1789. This deed was in these words :—

To all people, to whom these presents come, I, David Baldwin, of Heath, in the county of Hampshire and Commonwealth of Massachusetts, yeoman, sendeth—Greeting.

Know ye, that whereas Thomas Kendall, late of Charlemont in the aforesaid county of Hampshire, deceased, was seized, in his own right, in fee, of a certain estate or right of land in the town of Sal-

tash in the state of Vermont, so called, and whereas I, the said David Baldwin, did take upon myself the administration of the estate of the said Thomas Kendall, deceased, and, in pursuance of said duty of administration, did represent said estate insolvent, and also did obtain of the Supreme Judicial Court, held at Northampton, within and for the county of Hampshire, on the first Tuesday in May, in in the year of our Lord 1785, to make sale at public vendue, to the highest bidder, the whole of the real estate of the deceased, and did accordingly sell the said estate at public vendue.

Therefore, consideration of six pounds to me in hand paid before the delivery hereof by Jonathan Wilder, of Lancaster, in the county of Worcester, in the commonwealth of Massachusetts, yeoman, the receipt whereof I do, in the capacity of administrator aforesaid, hereby acknowledge, and do, in the capacity of administrator aforesaid, in the name and behalf of the heirs, of the executors and administrators of the above said Thomas Kendall, forever quitclaim unto him, the said Jonathan Wilder, his heirs and assigns forever, all the said right of land in the town of Saltash aforesaid, which did belong to Thomas Kendall, it being the original right of John Grimes, the said Jonathan being the highest bidder therefor. In Witness, &c.

To this evidence the defendants also objected; but the objection was overruled by the court. No deed was shown from David Baldwin to Thomas Kendall; but testimony was given tending to prove, that the David Baldwin, to whom the deed of Josiah Willard was given, was the same man that executed the deed as administrator of Kendall, above recited.

The plaintiff also gave in evidence a copy of a deed, duly certified, from Jonathan Wilder to Luke Rice, dated March 6, 1787, purporting to convey the right of Grimes, above mentioned. It appeared by the proprietors' records, that Luke Rice, from 1787, was regarded by the proprietors of the town as the owner of the right of Grimes, that he acted in the proprietors' meetings, and was chosen treasurer of the proprietors, and that land, including the pitch, or survey, hereinafter mentioned, was duly assigned to him, sufficient to make up the whole right of Grimes. The plaintiff also gave in evidence a copy of the record of the survey of a pitch, made by Luke Rice September 12, 1787, and duly recorded, purporting to locate one hundred and fifteen acres of land upon the right of Grimes. It appeared, that, by a vote of the proprietors, all such surveys were confirmed to the persons making them, as part of their respective rights, and that the pitch made by Luke Rice, above

mentioned, was assigned to him by vote of the proprietors in 1795, in lieu of his draft on the right of Grimes. It appeared, that in 1792 Luke Rice went into possession of this land so surveyed; and by a series of deeds the land contained in said survey was conveyed from Luke Rice, through various persons, to the plaintiff, and possession accompanied the same, and the plaintiff claims the land, in this suit, as a part of the land contained in this survey.

The defendants showed by the proprietors' records, that in 1795 the proprietors voted, that Joseph Crary, their surveyor, complete a survey of the town, and make a field book and plan thereof; which was accordingly done in 1796, and the field book and plan were deposited with the proprietors' records, and have ever continued therewith in the proprietors' and town clerk's office, and have ever been regarded as the true field book and plan of the town. The field book and plan lay down the survey made by Luke Rice, with the lines and boundaries thereof; and the right granted by the charter to the first settled minister in the town was located next south of and adjoining the Luke Rice survey. No actual possession was taken of any part of the minister right, either by the first settled minister, or by or under the town, until 1842, when the town leased a part thereof; and afterwards, in 1844, the town leased another part to the defendant Edson, who thereupon entered and cut the timber upon a part of what was so leased to him.

This entry and possession the plaintiff insisted, and gave evidence tending to prove, was upon the land contained in the survey made by Luke Rice, as above, and north of the true original southerly line thereof. The defendants gave evidence tending to prove, that the true southerly line of said survey is northerly of the part, of which Edson so took possession, and that the land, of which he took possession, is on the minister right.

The defendants gave evidence tending to prove, that Luke Rice and those who owned and possessed this land under him, down to and including the plaintiff, had from time to time, on various occasions and to divers persons, pointed out a line as the southerly line of said survey, and had uniformly claimed only to that line, until after the year 1840; and that neither the plaintiff, nor any of those under whom he claims, ever made any clearing, or inclosure, beyond or even so far south as to the line, so shown by them as the south-

erly line of their land; and that the line so shown is north of the clearing so made by the defendants, and of the land of which they took possession.

The plaintiff gave in evidence the deposition of Luke Rice, taken July 8, 1847; and the defendants gave in evidence the depositions of Richard R. Ellis and Nancy S. Rice, in which they testified to declarations made by Luke Rice, and conversation between the plaintiff and Rice, at the time Rice's deposition was taken.

The plaintiff requested the court to charge the jury, that he was entitled to hold all the land contained in the survey made by Luke Rice, and that, if the defendants had cut timber and held possession on any part thereof, as the original corners and lines were made and marked at the time of the survey, they should return a verdict for the plaintiff. The plaintiff also requested the court to charge the jury, that the depositions of Richard R. Ellis and Nancy S. Rice were not legal evidence, to show what were the original lines or corners of said survey.

The defendants requested the court to charge the jury, that if they found that Luke Rice and the persons owning and occupying the land included in said survey, down to and including the plaintiff, had always, before and until 1840, shown and claimed only to a certain line as the southerly line thereof, and as the line between their land and the minister right, the plaintiff could not now be permitted to claim and recover for land southerly of that line; and also requested the court to charge the jury, that the depositions of Richard R. Ellis and Nancy S. Rice, and the matters therein contained, were competent testimony, tending to prove what were the true original corners of said surveyed land.

The court charged the jury,—among other things,—that if they found the true original southerly line of said land, so surveyed by Luke Rice, was where the testimony of the defendants tended to prove, northerly of the chopping and possession of the defendants, they should find their verdict for the defendants; that in determining where were the true original lines and corners of the land surveyed by Luke Rice, the jury should regard the statements, claims and acts of the owners and occupants of said land, while they were such, including those of the plaintiff, as evidence of much weight, but not as conclusive; that if the jury found, that the true original southerly

line of the survey was not where the defendants claim, but was where the plaintiff claims, southerly of the possession taken by the defendants, they would then proceed to inquire, whether the plaintiff has legal title to the land; and on this point the court instructed the the jury, that if they found, that the David Baldwin, who executed the deed to Jonathan Wilder, was the same man, who received the deed from Josiah Willard, then the plaintiff had shown a legal title to the land contained in the survey of Luke Rice, and was entitled to hold all the land contained within its original limits; that if the jury did not find, that said David Baldwin was the same man mentioned in the two deeds, the jury might, from the lapse of time that Luke Rice acted and had been received as the owner of the Grimes right, the allotment of land to him accordingly, and the acquiescence therein, and the taking possession and disposal of land under said claim, presume a deed, or conveyance, from the David Baldwin, who received the deed from Josiah Willard, to Kendall, which has been lost, provided the jury believe such to have been the fact; and that, if the jury so found, the plaintiff had shown legal title to the land contained in the survey of Luke Rice, and was entitled to hold all the land contained within its original boundaries.

The court also charged the jury, that if they did not find, that the David Baldwin mentioned in the two deeds was the same man, and did not find, that any deed of said land had ever been executed to Kendall, then the plaintiff's title to the land was only possessory, and good only by virtue of the statute of limitations, and in that case the plaintiff could only hold to such line, as he and those under whom he claimed had shown as the southern boundary line of their land, and southerly of which they took no possession; and if, from the testimony, they found such to be the fact, and that such line was north of the defendants' possession, then their verdict should be for the defendants, notwithstanding they found the original south line of said survey to have actually been southerly of the defendants' possession, and where the plaintiff claims. In regard to the depositions, the court charged the jury, that the statements of Luke Rice as to the boundaries of his survey, made by him long after he ceased to own or occupy the land, as testified to by Ellis and Nancy S. Rice, in their depositions, were not legal evidence of such bounda-

XXIII. 56

ries, and that the only proper effect of the depositions was to weaken and discredit the deposition of Luke Rice.

Verdict for plaintiff. Exceptions by defendants.

*S. Fullam* and *Tracy, Converse & Barrett* for defendants.

The defendants insist, that the court erred in admitting the copies of the deeds objected to. No copy of a deed can be admitted in evidence, unless by virtue of some statute law. The constitution of this state requires all deeds and conveyances of land to be recorded in the town clerk's office of their respective towns, and for want thereof, in the county clerk's office. Rev. St. 27, § 35. This provision of the constitution has been in force since July 4, 1793; and we have no statute authorizing office copies of deeds recorded out of the state to be used as evidence in this state. The copies are not properly authenticated. Ingersoll's Abr. U. S. Statutes 299.

The case shows, that Luke Rice pitched the lot Sept. 12, 1787, and went into possession in 1792, and that the minister right was laid out afterwards, and a plan and field book was made in 1796, locating the minister right south of and adjoining the Luke Rice lot. The defendants insist, that if Luke Rice and those claiming under him claimed to the line, to which the defendants claim, and recognized it as the true line between the lots for fifty years, they are estopped from going farther south than that line; and hence the court erred in refusing to charge as requested on that point. Again, if Luke Rice uniformly claimed to that line from 1792, and those claiming under him did the same, until 1840, that line became fixed by the statute of limitations, and should not now be disturbed. It is a plain case of owners acquiescing in a marked line between their timber lots for fifty years.

The defendants also insist, that the court erred in charging the jury, that if the David Baldwin, who executed the deed to Wilder, was the same man who received the deed from Josiah Willard, it made a good title in the plaintiff;—1. Because the David Baldwin who deeded to Wilder only professes to convey the title of Thomas Kendall by quitclaim deed, and everything else being regular, a title should be shown in Kendall. 2. If he were the same man, he might have conveyed away his right to the premises before he became administrator, and that title still be outstanding; which would

confine the plaintiff to his possessory right. 3. The laws of Massachusetts might have compelled him to deed all such lands, as the deceased claimed title to. 4. The deed does not purport to convey any right of Baldwin. 5. We deny that Baldwin would be estopped from asserting his own title by quitclaiming Kendalls.

The defendants also insist, that the court erred, in permitting the jury to presume a deed from long acquiescence. It seems strange, that a deed may be presumed from acquiescence, and yet the parties not be bound by an acquiescence in a division line the same length of time.

The charge of the court in relation to the depositions was clearly wrong.

*Washburn & Marsh* for plaintiff.

1. The deed from Grimes to Willard, which was recorded in Exeter in 1765, was properly received in evidence. Vermont was claimed as part of New Hampshire until 1777, when she declared herself an independent state. The jurisdiction of New York was repudiated by her citizens. The order in council of 1764, which declared Connecticut River to be the boundary between New Hampshire and New York, was never assented to by the citizens of Vermont, and was of no effect, and was in effect abrogated by the two orders in council of 1767, by which the act of New York, in creating the county of Cumberland, was annulled, and the jurisdiction of New York over the "New Hampshire Grants" was restrained. This left matters, as though the first order had never been made, and Cumberland county never constituted. Until 1771 New Hampshire was not divided into counties, and the office of the register of deeds of the state was at Exeter. Vermont being, at least *de facto,* a part of New Hampshire, the proper place to record this deed was Exeter. If this be so, the copy we produce is sufficient.

If this be not so, the deed was not required to be recorded. And in that event we are entitled to use the copy, as properly authenticated, coming from a known and public depository of deeds, where it is reasonable and probable the original would be deposited, and where it has been matter of public record for eighty five years. 1 Greenl. Ev. 182, 576. *Doe d. Neale* v. *Samples,* 8 Ad. & E. 151, [35 E. C. L. 363.] *Doe d. Jacobs* v. *Philips,* 8 Ad & E., N. S.,

[55 E. C. L.] 156. *Croughton* v. *Blake*, 12 M. & W. 205. *Doe d. Wm.* IV v. *Roberts*, 13 M. & W. 519.

2. The deed from Willard to David Baldwin was properly admitted. This deed was recorded in Keene, in May, 1781. Cheshire county was constituted in 1771. The first constitution of this state, adopted in 1777, provided,—Part 2. sec. 31,—that all deeds and conveyances of land should be recorded in the town clerk's office in their respective towns. The revised constitution of 1785,—Part 2, sec. 32,—required them to be recorded in their respective towns, and for want thereof, in the county clerk's office. Saltash was not organized until 1787,—after this deed was executed and recorded; Windsor county was constituted in February, 1781, but there was no county clerk until 1782. In April, 1781, the union between Vermont and many of the towns in New Hampshire, including the whole of Cheshire county, was consummated. And in April, 1781, the legislature of the state, thus constituted, created the county of Washington,—which included all of New Hampshire south of Claremont. This county of Washington adjoined Windsor county. Vt. State Papers 427. And the deed was undoubtededly recorded in Keene, which was the shire town of Washington county, for the reason, that there was no place in Windsor county, where it could be recorded. Either Keene, as being the shire town of an adjoining county, was the proper place to record the deed, or else it was not required to be recorded. If the former, then the copy we produce is sufficient, if the latter, then we may use the copy for the reasons stated above in reference to the deed from Grimes to Willard.

3. If the David Baldwin, to whom Willard conveyed, is the same David Baldwin, who, as administrator of Kendall, conveyed the Grimes right to Wilder, the effect of his deed as administrator, *reciting* that Kendall was owner of the land *in fee*, was to pass his own title, as against all the world. In construing all deeds, we are to give effect to them according to the *intent* of the parties, when that can be ascertained. 2 Smith's Lead. Cas. 522. *Blake* v. *Tucker*, 12 Vt. 39. *Comstock* v. *Smith*, 13 Pick. 116. In this instance the intent is apparent, on the part of Baldwin, to convey, and on the part of Wilder to receive, an *indefeasible* title. Under the statute of 1779 a deed, executed in due form and recorded, operated to transfer the land, without any farther ceremony. If, then, the grantor

had title and possession, his deed, properly executed, passed both, without livery of seisin. David Baldwin had both. His deed to Wilder *recites,* that the title *in fee* was so situated, that it might pass by that deed. Then the intent was, that it should so pass,— otherwise the act of the parties, in executing and receiving the deed, was nugatory. The deed is in the name of Baldwin, and is duly executed by him, and recorded. If it has no other effect, we claim for it the effect of a *grant* of Baldwin's title, and, of course, of the land. Any words will create a *grant,* which show the intent, that the land should pass.

But the *recital* operates upon the *interest in the land,* which was the subject of the conveyance, and, as an *estoppel,* bars parties and privies. It operated as much upon the interest in the land, and was as much a muniment of the title, as any covenant. 6 Pet. 612. But, inasmuch as Baldwin had both title and possession at the time, this estoppel is fed by the interest thus held by him, and makes the title of the grantee good against the world. The distinction is, that if the grantor have title and possesssion, which he can convey, and the intent to convey be apparent upon the deed, an *interest* passes to the grantee, either directly, as a *grant,* or indirectly, as an estoppel fed by the existing title, and thus becoming an interest ;—but if the grantor have no title at the time, which can pass, and the conveyance be only by grant, then there is no estoppel, and no interest conveyed, because the grant operates upon the present estate only. But if the grant be with warranty, then the estoppel is created, and this becomes an *interest* by reason of the subsequently accruing title to the grantor, for the same reason given in the preceding case, —that is, the intent of the parties, that it should so operate. *Trevivan* v. *Lawrence,* 1 Salk. 276. *Doe d. Christmas* v. *Oliver,* 10 B. & C. 181, [21 E. C. L. 50.] *Weale* v. *Lower,* Pollexf. 66, cited in 3 Pick. 59. *Dudley* v. *Cadwell,* 19 Conn. 226. *Somes* v. *Skinner,* 3 Pick. 52. *White* v. *Patten,* 24 Pick. 324. *Stow* v. *Wyse,* 7 Conn. 214. *Shelley* v. *Wright,* Willes 9. *Green* v. *Clark,* 13 Vt. 158. 2 Smith's Lead. Cases, 511, 522. *Blake* v. *Tucker,* 12 Vt. 39. STORY, J., in *Crane* v. *Morris,* 6 Pet. 612. *Paine et al.* v. *Smead,* 1 D. Chip. 56.

4. If the identity of the persons is not proved, then the jury were correctly instructed, that they might *presume* a deed from Baldwin

to Kendall, which is lost. *Jackson* v. *Russell*, 4 Wend. 543. *Carver* v. *Jackson*, 4 Pet. 83. *Crane* v. *Morris*, 6 Pet. 598, 612.

5. The declarations of the plaintiff and those under whom he claims, as to the location of the south line of the Luke Rice survey, can operate no estoppel upon the plaintiff from proving, under a claim of *title in fact,* that the *true* south line was in a different place, and that the declarations were made under a mistake. It is not pretended, that these declarations have operated any fraud upon the defendants. The defendants have had no possession, in law or fact, of the disputed premises, until since 1844, and if the plaintiff has had none, the only effect has been, to leave the possession *vacant,* subject to be controlled, at any time, by the *true title.* These declarations could only operate to limit the *possessory* title of the plaintiff, and that effect was fully given to them by the charge of the court. *Brown* v. *Edson et al.,* 22 Vt. 357.

The opinion of the court was delivered by

REDFIELD, J. This case involves numerous questions, and many of very considerable importance. The case being presented very much at length on the exceptions, and having been very thoroughly discussed at the bar, it seems important to the interests of the parties, that all the questions presented, which are material to its final determination should now be decided.

I. The first question arises in regard to an office copy of a deed from John Grimes to Josiah Willard of the right in question, being the right of said Grimes to one share of land in the town of Saltash, (now Plymouth,) dated July 15, 1765, from the registry of deeds in Exeter N. H. The registry is dated "July ye 18, 1765." This copy is certified by the present register ; and his authentication is verified by the certificate of the clerk of common pleas of that county. Two questions are made in regard to this copy.

1. Whether the original registry is of such a character, that it can be regarded as evidence of the original deed. This will depend upon the inquiry, whether, at the date of the registry, there was any law justifying such registry. We should always incline to give effect to such ancient proceedings, if possible, upon the ground, that the very fact of their having been taken raises some presumption in their favor, that, at the time, they were regarded as valid, and

unless we can perceive some good ground, upon which their insufficency rests, it ought to be presumed, that some law then existed, by which the proceeding was justified, and which has escaped our investigation, through the obscurity, which lapse of time always induces. This is not only just, in order to preserve and give efficacy to things, as they exist, but will very often be abundantly vindicated by more thorough examination. And in the present case, we do not positively know, that some such law did not exist. And we do know, that this portion of the state was in those early times claimed by the inhabitants to belong to the state of New Hampshire, and the jurisdiction *de facto* was, for many years, always somewhat in *dubio* between New York and New Hampshire, the jurisdiction *de jure* always belonging to New York, probably, but New Hampshire in fact maintaining the actual government,—which is the sufficient justification for going there for official acts. We are not prepared, then, to say, that this registry is not authentic; but we do think, that more proof should be put into the case, to show affirmatively that such was the law, and the practice, at that date.

2. Is this authentication sufficient to make the office copy legal proof of the original? The general rule undoubtedly is, that where the constitution of the United States has reserved any subject to the congress of the United States, and they have legislated in regard to it, the provisions of such enactment are exclusive, and supersede all other provisions of law. We see no good reason, why this should not be applicable to the subject of authenticating records of the courts of the different states, and other proceedings. In Greenl. Ev. 606, in note, are numerous cases cited to show such is not the law; and see *State* v. *Stade*, 1 D. Chip. 303. And we do not think such has been the course of practice. It is every day's practice to prove the laws of other states by the printed statute books of those states, and this has been acquiesced in. So, too, I have known copies, from the records and proceedings of other states, authenticated much in the manner these copies are, to be received. But generally, of late certainly, they have been more formally authenticated; and if there be a law upon the subject of authenticating such copies, we do not see, why it should not be followed. *Starkweather* v. *Loomis*, 2 Vt. 575. *Blodgett* v. *Jordan*, 6 Vt. 580. The case of *Ingersol* v. *Van-Gilder*, 1 D. Chip. 59, where it is said, that a judgment of a justice

of the peace in another state need not be authenticated in conform-
ity to the act of congress, and that it is only *prima facie* evidence
of the debt, has not been regarded as law, upon either point, for
many years.  A justice must certify his record, and then certify, that
he has no seal, or clerk, but acts as clerk of his own court, and
that the foregoing attestation is in due form ; and such record is as
conclusive to all intents, as a record of the highest court in the
state.   The case of depositions taken in other states does not come
within the act of congress.   The party may always give evidence of
a record, or *quasi record,* like an enrolment, or registry, by a sworn
copy ; but if he resort to an office copy, it should be legally au-
thenticated.

II.   The deed from Josiah Willard to David Baldwin, dated Feb-
ruary 21, 1781, seems to us to merit a different consideration.   This
is attempted to be proved by a copy of a registry in the registry of
deeds in the county of Cheshire and state of New Hampshire.   Now
so far as the land in Plymouth was concerned, there was not the
least pretence for making a registry of this deed in any county in
the state of New Hampshire.   This state was fully organized as
early as 1777, and has ever since maintained that organization.
The first constitution was established in July, 1777, and provides,
that all conveyances of land shall be recorded in the town clerk's
office.   And by statute passed in 1779 it was provided, that deeds
of land shall be recorded in the town clerk's office, where they
have one, and if not, in some adjoining town, and for want of a clerk
in such adjoining town, in the county clerk's office.   And at the date
of this deed, (and as early as 1779,) two counties were fully organ-
ized, with clerks, and books of registry, Cumberland and Benning-
ton—this town belonging to the former.   So that we see no excuse for
recording this deed in Cheshire county, New Hampshire, more than
in any other place.   So that if we could apply the same rule to the
authentication of this copy, which has been applied to the presump-
tive proof of originals, from lapse of time and their being brought
from some proper place of deposit, (which has never yet been done,)
we should yet find, that the facts in the case did not come within
the rule.   And yet it is undoubtedly true, that the copy affords some
kind of moral evidence of the existence of such an original, but not
coming within any rule of legal proof.   This deed no doubt should

have been recorded in Cumberland county.    But such mistakes no doubt exist in this state to a very considerable extent,—the grantees recording their deeds in the old counties, after the newer counties were organized.    I have myself found such mistakes, in tracing land titles, while at the bar,—more generally, perhaps, where the deed contained lands in both the old and new counties; but I could never devise any mode, by which such departure from the law could be justified any more in the registry of ancient deeds, than later deeds.    In either case the registry is made without any warrant of law, and is not record evidence, any more than if recorded in the office of the register of probate.    Possibly this may form a proper subject of legislative interference.

III.    In regard to the passing of the title from Baldwin to Jonathan Wilder, there is undoubtedly some irregularity, not easily explained. It is an attempt to convey land in this state, the title of which was in a deceased person, by virtue of an administrator and order of sale, obtained in the state of Massachusetts.    Such administrator could have no authority, as such, over lands in this state.    No rule of law is better settled, than that the authority of an administrator is strictly confined to the jurisdiction.

But in the particular case, if the deeds attempted to be proved were properly in evidence, and the identity of the parties shown, the title would be in the administrator himself, instead of his intestate. In such a case it becomes a grave question, whether the grantor is not estopped to deny, that whatever title he possessed did pass.    I should, for one, be inclined to believe such must be the effect of his deed.    It has often been held, that the owner of land, who stands by and aids in the execution of a deed of such land, by a stranger, and himself becomes a witness of the conveyance, is thereby estopped to deny, that the title passes; *a fortiori*, if he give a deed of the land himself, although as administrator of some one possessing no title, and of whose estate he has no legal administration.

IV.    But the jury are told, that if they do not find the David Baldwins to be the same persons, then they may presume a deed to Kendall from the circumstances in the case, if they believe such to have been the fact.    We think this part of the charge was erroneous.    From what has been said above it is evident, such a deed will not avail the plaintiff, until he shows a legal conveyance from Ken-

XXIII.    57

dall.   But we do not think there is, in the present case, any legal
ground to presume a deed.   It is done, not to quiet a possession,
but to extend title, when no possession existed.   Possession, as has
been always held, is the indispensable basis, upon which all such
presumptions must rest.   The books are full of cases to this effect.
*Appleton* v. *Edson*, 8 Vt. 239, is a full authority to this point.
There are many cases in the Vermont Reports to the same extent.
A case in this county at the last term went upon the same ground.
*Williams* v. *Bass*, 22 Vt. 352.

The fact, that Luke Rice and his grantors had deeds on record
of the right of Grimes, and were recognized as the proprietors by
the other proprietors, is not sufficient.   Such cases, in the northern
counties in the state, occur every term of their county courts, al-
most ; and if this rule of presuming deeds were to obtain, when an
ancient deed could not be found, it would change the title of im-
mense tracts of land, which are now esteemed as fully settled in
another direction, perhaps.   It would be impossible to make any
such presumption, except in favor of actual possession ; and that
would not be necessary, except in cases where the statute of limita-
tions does not apply, as the title would have become quieted by the
statute of limitations.

V.   We think the acquiescence offered to be shown, or which the
testimony tended to show, in regard to the divisional line between
the Luke Rice pitch and the minister's right, must be regarded as
sufficient to establish that, as the true line.   We must take it for
granted, that the true original line was the one, which the jury have
established by their verdict.   But the testimony tended to show, that
Luke Rice, and those who derived the title from him, down to the
plaintiff, as late as 1840, while in possession, pointed out and claimed
the line attempted to be established by the defendant, as the true
division line between the Luke Rice pitch and the minister's right.
Luke Rice went into possession in 1792.   Since that time, in 1796,
the remainder of the town was surveyed, and the minister's right
laid down, as adjoining the Luke Rice pitch, and we may presume,
on the faith of this new line, claimed by Rice, being the true line
of his pitch.   Such a state of facts would operate an estoppel upon
the proprietors of the plaintiff's lot.   And the mere acquiescence in
a line as a dividing line, between adjoining proprietors, for fifteen

years, although but one of the owners, and perhaps neither, is in actual possession, is, we think, sufficient to establish that line, as the true line of division, if known and claimed by both proprietors,—which would very naturally be the case, when one of the owners was in actual possession. This is the only acquiescence there ever is in the actual division of towns by survey only, when no actual possession exists, and that has always been held sufficient to make the division binding upon all the proprietors. If so, we see no reason, why a similar acquiescence should not bind adjoining proprietors.

VI. In regard to the depositions, we have no doubt, they contain some testimony of the admissions of the plaintiff, which may be used by the defendants; but it does not appear, that this particular question was brought to the notice of the court below. It seems then to have been claimed, that the declarations of Rice were evidence; and the ruling of the court seems to have gone upon this point, probably.

Judgment reversed and case remanded.