MARGARET B. SOWLES AND EDWARD A. SOWLES *v.* HARRIET G. MINOT ET AL.

October Term, 1904.

Present: ROWELL, C. J., TYLER, MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed September 7, 1909.

*Estoppel by Deed—Common Grantor—Possession—Presumptions —Mortgages—Discharge—Rights of Mortgagor—Limitation —Abandonment of Real Property—Of Water Rights—Deeds —Construction—Interest Granted in Water Power—Adverse Possession—Essentials—Possession under Color of Title— Sufficiency of Description—Boundaries—Courses.*

Where both parties claim title from the same source, neither can question the title of the common grantor.

A grantee of land will be treated as having received possession along with the deed, although there is no evidence that he ever actually took possession.

The legal title to real estate passes to the mortgagee upon condition broken; and there is no presumption that a mortgage note was paid at maturity.

Although the legal title to real estate passes to the mortgagee upon condition broken, in equity, he holds it only as security for the debt, and the burden is on him, and those claiming under him, to show enlargement of his title.

It is only in support of actual possession by the mortgagee that the law will presume a relinquishment to him of the mortgagor's interest.

The lapse of fifteen years without recognition of the mortgagee's interest by payment or otherwise, and without enforcement of the security, defeats his interest in the property.

A failure to occupy land for an indefinite time does not constitute an abandonment of title or possession.

The right to a water power cannot be lost by its nonuser.

It seems that real property corporeal or incorporeal, held by grant, cannot be lost by nonuser.

At any rate, there can be no abandonment without intent to abandon, so that the mere nonuser of a water power would not warrant the inference of intention to abandon it, even if the right to use it could be lost by nonuser; nor will such abandonment be inferred from failure to pay taxes.

A grant of land "with the privilege of taking and using from the flume now occupied by" a designated person, "or any other flume which may be thereon located, sufficient water to carry two tub bellows for a blast furnace" made the reference to the tub bellows the measure of the power granted, and not a restriction on its use.

Where a tract of land was excepted from a conveyance, its enclosure by one holding under the grantee in the conveyance, and the use thereof for fifteen years as a hog lot, would not give title by adverse possession, where there was no evidence that such user was under a claim of right.

The doctrine that possession of any part of a tract of land, under a deed giving color of title to the whole, will constitute constructive possession of the whole, applies only to possession under a deed that gives definite and certain boundaries.

Defendant's title originated in two deeds by the same grantor, a deed of an undivided half of 28 acres of an original right, which conveyance covered designated water privileges and mills, and a subsequent deed of the remaining half, stating that it was the whole of the lot on which the grantor resided. Later conveyances described the property by reference to the original description, except one deed that conveyed a larger tract from which the undivided half of the 28 acres was excepted, and still later deeds bounded the premises by general reference to the land of others. *Held*, that the original conveyance of the undivided half of the 28 acres afforded no indication that the 28 acres was all of the allotment, and that neither it, nor any of the subsequent deeds, sufficiently designate the boundaries to support a claim of constructive adverse possession.

The change of a course in a subsequent deed from "northeasterly" to "northwesterly" and other variations from the original description, may be disregarded as immaterial, where the description as gathered from all the deeds shows that the changes were errors.

In a deed, the expression "southerly or south," used to describe a definite course so many degrees west, must be read "south," unless the course is controlled by an ascertained monument.

A line called in a deed "fifty feet, more or less" in a certain direction, must be taken to be of the length stated, unless the distance is controlled by other calls.

A court cannot disregard the direction of the starting point as given in a deed without some definite information concerning the monuments showing the stated course to be erroneous.

APPEAL IN CHANCERY. Heard on the pleadings, and master's report at the March Term, 1904, Franklin County, *Start,* Chancellor. Decree, strictly *pro forma,* dismissing the bill. The orators appealed. The opinion states the case. The following is the map referred to in the opinion.

*E. A. Sowles* and *Farrington & Post* for the orators.

Boundaries may be established by any testimony tending to fix and identify them. *Baker* v. *Sherman*, 71 Vt. 439; and it is not necessary to the validity of a grant that every part of the description should be literally true. *Day* v. *Adams*, 42 Vt. 570; *Leppel* v. *Kelley*, 48 Vt. 575; *Barnard* v. *Russell*, 19 Vt. 334; *Rutland R. R.* v. *Chaffee*, 71 Vt. 84; *Sowles* v. *Butler*, 71 Vt. 278.

The language in the deed respecting "two tub bellows," had reference to measure of the power granted, and not to a restriction of its use. *Adams* v. *Warner*, 23 Vt. 595.

*C. G. Austin & Sons* and *Fuller C. Smith* for the defendants.

MUNSON, J.   This case was fully heard by the late Henry E. Rustedt as special master. His death occurred soon after the hearing was completed, and without a report having been filed. The testimony having been stenographically reported, the parties agreed that the case might be heard by the late Chancellor Start on the depositions, exhibits and evidence taken, and joined in a request that the chancellor inspect the premises. It was also agreed that if either party considered further testimony necessary, such party might apply to the chancellor for permission to introduce it, and that the chancellor, in his discretion, might order it to be taken and prescribe the form of taking. Nothing was done under this provision; and the case was finally disposed of by Chancellor Start, then in failing health, strictly *pro forma* and without hearing.   So the case is before us for the determination of both fact and law; and the proposition for a view of the premises, made by one party since the hearing, not being acceded to by all the parties, it becomes necessary for us to settle the facts without the benefit of the inspection contemplated by the original agreement.

The bill alleges ownership of a water privilege on Fairfax Falls under deeds from Daniel Wilkins and successive grantors, concerning which it is stated that the defendants claim inaccuracies of description; and alleges that the defendants are about to destroy the power by a removal of rocks that will change the channel; and prays for an injunction in that behalf and a quiet-

ing of the orators' title. The answer denies that the title remained in Wilkins's grantees until they made conveyance, and alleges that if the title did remain in them and pass by their conveyance, it has since been lost by adverse possession; denies that there is any inaccuracy of description in the Wilkins deed, but alleges that it is now impossible to locate the grant; denies that the defendants have made or contemplate making any change in the channel, and alleges that natural alterations in the bed of the stream have destroyed the power in question.

Before taking up the orators' chain of title it will be well to refer to some earlier conveyances. Prior to May 25, 1803, Asa Wilkins became the owner of a large tract of land which included Fairfax Falls. On that day he conveyed to Louis Sherrill a privilege on or adjoining the falls, a little above the old sawmill, for the purpose of a carding machine, with the privilege of a road to and from said machine, and the privilege of drawing what water might be necessary for carrying on the business of said machine. December 1, 1803, Asa Wilkins executed to Daniel Wilkins a warranty deed of one-third of the farm and mills. October 6, 1809, said Asa conveyed to William Crane one-half of certain carding machines, carding machine house, and road thereto, with the privilege of drawing water to carry said machines or to carry on any business that could be done in said house, the water privilege to revert if the carding machines should be removed or not kept in repair; which deed recited that the machines and house were the same built by Louis Sherrill and sold by Sherrill to the grantor. April 2, 1816, Asa Wilkins quitclaimed to Daniel Wilkins the entire tract and falls, with mills and other buildings thereon. April 10, 1816, Daniel Wilkins conveyed to William Crane a piece ''beginning at a notch in the rocks at the southwest corner of the carding machine house, * * thence north thirty-three degrees east forty-four feet; thence west thirty-three degrees north forty feet; thence south forty-four feet; thence east thirty-three degrees south thirty-two feet to the first mentioned bounds''; with the privilege of drawing water to carry on the business of carding wool and the clothiers' works, or water to carry on any other business drawing the same quantity as the carding and cloth dressing business. January 22, 1822, Daniel Wilkins conveyed to W. B. Parker and I. A. Webster a site for a grist-mill, describing

it as beginning about two rods and one-half southeast from the southeast corner of the Crane mill, with the privilege of taking water from the dam.

We come now to a statement of the orators' title. January 14, 1828, Daniel Wilkins conveyed by warranty deed to David Nichols and Allen L. Nichols, for an expressed consideration of $75, property described as follows: "Beginning northeasterly of Crane's carding works, at a rock notched N, thence southerly, or south, thirty degrees west forty feet to a cross in a rock, thence making a right angle and running westerly fourteen feet, thence making a right angle and running southerly ten feet, thence making another right angle and running easterly fifty feet, be the same more or less, to the road leading to Crane's carding works, thence on said road fifty feet to a stake and stones, from thence making a right angle and running westerly to the first mentioned bounds, with the privilege of taking and using from the flume now occupied by said Crane, or any other flume which may be there erected, sufficient water to carry two tub bellowses for a blast furnace, reserving to said Crane the right of water sufficient for his carding and clothing works." On the same day the grantees of the premises mortgaged them to the grantor to secure a promissory note for $75, to be paid in hollow ware or iron castings on or before October 1, 1829, with interest. The mortgage was recorded before the maturity of the note and has not been discharged of record. Nothing appears regarding the payment or possession of the note. November 10, 1848, David Nichols and Allen L. Nichols quitclaimed the premises to Andrew J. Soule; the signature of David having but one witness. August 22, 1865, Soule executed to Hiram Bellows a quitclaim that was evidently intended to convey the same property. In the last two deeds the course of the first line was given as 39° west instead of 30°, and in the last deed the place of beginning was put northwesterly from Crane's mill instead of northeasterly, and the call for a right angle in running the third line was omitted. Bellows died in 1876, without having conveyed the title, and the oratrix Margaret claims the property under his will and the will of his wife, Susan B., who died in 1880.

Privileges upon the falls other than the ones above described were subsequently granted by those who took the remainder of David Wilkins' right; and there have been many conveyances of

the different interests, as shown by the 84 deeds introduced by the defendants. For the purposes of this inquiry it may be assumed that all the rights, except the one claimed by the orators, are now united in the defendants by written evidences of title. It will be necessary to trace the main line of these conveyances.

January 8, 1833, Daniel Wilkins conveyed to Erastus Cross by warranty deed ''one equal undivided half of 28 acres of land of the original right of Frances Panton· or Fanton, which 28 acres covers the grant in Fairfax on the river Lamoille, together with the water privileges and mills thereon standing''; in which deed exceptions were made of the grist-mill privilege deeded to Parker and Webster, the carding and cloth dyeing privileges deeded to William Crane, and certain parcels not connected with water rights. March 12, 1833, Wilkins quitclaimed to Erastus Cross as follows: ''All my right * * in the whole of the lot of land on which I now reside, and one equal undivided half of which I conveyed to said Cross by deed * * dated January 6, 1833, meaning hereby to convey the other equal undivided half of said lot,'' referring to the record of said deed for further particulars. Erastus Cross had previously become the owner of the grist-mill property by deed from Isaac N. Soule dated December 8, 1832; and on the 23d of December, 1833, he quitclaimed certain land to Joseph Cross by the following description: ''Being the same deeded to me by Isaac N. Soule and Daniel Wilkins A. D. 1832, also all right and title I have in a grist mill, saw mill, and shingle mill, all deeded me by said Soule and Wilkins, for a more particular description of which reference being had to said deeds.'' April 3, 1834, Joseph Cross quitclaimed to Erastus Cross as follows: ''Being the same land mills and machinery and the whole of the estate that the said Erastus deeded to me * * December 23, 1833,'' referring to the record of said deed for a more particular description and excepting the grist-mill property and the shingle machine. On the same day Erastus Cross quitclaimed to John Warner and Silas W. Brush, describing the property as all the estate ·deeded him by Daniel Wilkins by his deeds of January 8 and March 12, 1833, and referring to the records. May 24, 1834, Brush quitclaimed to Warner as follows: ''All the right, title and interest I have in and to * * the Fairfax Falls, meaning hereby to convey all the land I ever owned in the town of Fairfax.'' October 27, 1836, William Crane quit-

claimed to Warner and Brush the following: "All my right * * in the water privilege at Wilkins Falls so-called * * with my other privileges appertaining to said water privilege." February 3, 1840, Warner conveyed to Silas Smith property described substantially as follows: All the real estate deeded me by Erastus Cross, April 3, 1834, and a certain other piece deeded me by William Crane, being the same land deeded him by Daniel Wilkins April 10, 1816, referring for further description to the records of all the deeds mentioned; with the privilege of erecting a grist-mill or other machinery on the last described premises, with the right to use the quantity of water specified in Wilkins' deed to Crane. March 22, 1845, Smith quitclaimed to Warner, describing the property as the same deeded to him by Warner, with reference to the record. In the meantime Solomon Bradley had become the owner of the grist-mill property by deed from Joseph Cross. January 10, 1846, Warner deeded to Blinn and Barstow a piece extending from the bridge above the dam northerly to the grist-mill property. April 6, 1852, Warner conveyed to Samuel N. Gaut, by metes and bounds, a tract on both sides of the river, which is further described as follows: "Meaning to convey all the lands and water privileges in and about the great falls * * whether described in the above description or not; excepting all I have heretofore deeded to Blinn and Barstow, also the old grist-mill privilege, also the privilege deeded to Daniel (?) Nichols and Allen L. Nichols by Daniel Wilkins the 14th day of Jan., 1828." January 31, 1881, Gaut quitclaimed the property to Harriet G. Minot, bounding it by adjoining owners, and describing it further as all the land he owned at or about Fairfax Falls and the water privileges connected therewith; and on the same day Mrs. Minot quitclaimed an undivided half of this to Susan E. Gaut. June 3, 1902, Mrs. Minot and the heirs of Mrs. Gaut quitclaimed the entire tract to certain of these defendants.

The general course of the Lamoille river through the section involved in our inquiry is about north. The fall consists of an irregular descent, covering about thirty rods, and amounting to nearly ninety feet. All the mills and mill sites mentioned in the exhibits and testimony are on the easterly bank. The mills now existing are located at the head of the falls, and are supplied from the dam. Prior to 1873 there were mills just below the falls, which took their power from a lower point hereinafter

described. The questions of location to be determined are confined to the section between these upper and lower mill sites. The highway runs a few rods from the river in the same general direction, but makes the first part of the descent from the upper level with a slight bend towards the stream, after which it runs in a straight line a little east of north. Irregular ledges corresponding with the upper section of the falls run diagonally across the space between the river and the road in a northeasterly direction, striking the road at the lower part of the bend. Running beneath these upper ledges, from a point in the highway at the lower end of the bend to a small level space near the edge of the falls, in a line nearly straight, is a natural path, much used in later times by parties visiting the falls. A few feet from the highway, on the northerly edge of this path, is a large flat rock, which is of importance in our inquiry. From this path beneath the upper ledges, and from the westerly line of the straight road north of the bend, there is a steep and rocky descent toward the stream. The narrowest place between the road and the river is in an east and west line crossing the flat rock, and south of this line the rocky descent extends to the edge of the stream.

The marks upon the rocks called for by the orators' deeds have not been found. The other objects mentioned in the description are Crane's carding mill, the road leading to it, and the flume supplying it. So the first point of inquiry is the location of Crane's carding mill. This building was carried off by a flood in the early thirties. It was without artificial stone foundation, and no vestige of it remains. But the parties are agreed that some part of the building stood on the flat rock above mentioned, marked H on the orators' plan; and all the evidence indicates that the rear of the building stood on timbers resting on the rocky slope before described. There is no satisfactory evidence of the size and shape of the building. Without presenting in detail the evidence upon which our conclusion is based, we locate the northeasterly corner of the Crane mill on the westerly part of the flat rock, with the easterly face of the building extending upon and along the edge of the path as it is indicated on the orators' plan.

The power which supplied Crane's mill, as well as the mills below, came from a point more than half way down the falls,

where a large rock, standing a few feet from the edge of the river, separated some of the water from the main body of the stream, and caused it to flow for a short distance in a separate channel, divided from the main channel by a ledge of rocks. The rock first referred to, in connection with rocks in the bank opposite to it, formed a natural frame, in which a structure was placed to control the flow, and from which a flume conducted water to the mill. This gorge in the rocks, where the Crane bulkhead was located, is nearly opposite the spot before described as the lower terminus of the path now used by parties visiting the falls. The orators' claim that this path marks the location of the old road referred to in their deeds. The defendants insist that there never was a road here, and that if there was it could not be called a road leading to Crane's mill. The distance from the flat rock to the end of the path is about nine or ten rods. We conclude from the evidence that neither the grade nor the adjacent rocks were such as to make the location impracticable for teams. The defendants introduced some testimony as to indications of an old road that left the highway at a point a little distance north of the flat rock and came down towards the river in the rear of the Crane mill site, but we do not find that there was such a road. It is true that the road claimed by the orators must have ended at the spot described as the end of the path. The evidence precludes the possibility of its being a section of a road coming down the rocks from the south. But the terminus described is at the top of a steep slope that goes down to the gorge where the bulkhead was located. There is no suggestion that the vicinity of the bulkhead was accessible to teams coming up the bank of the stream from the flat below. The testimony of witnesses who in their youth worked in the lower mills, and assisted in the work of maintaining the bulkhead at this point, gives us a general understanding of the timbers required in its construction, and the frequency with which they were carried out by floodwood and ice; and we can judge from this what was going on in the earlier period concerning which no testimony can be had. The Crane carding mill had been in operation twenty-five years when the deed to the Nicholses was given, and it may easily be conceived that this line of approach to the bulkhead had then become known as a road used in connection with the carding mill, and that a surveyor running a line from the
23

bulkhead to the end of it might describe it as the road leading to Crane's mill.

The description in the orators' deeds, taken as it reads, requires that the lot be located northerly from the Crane mill site. The orators read the direction governing the starting point "southwesterly" instead of "northeasterly" as given in the first deed or "northwesterly" as given in the deed to Bellows, and so bring the lot southerly from the Crane mill site. This enables them to locate the westerly lines of the lot on the stream, with the easterly line resting on the lower part of the path or road above described. This location lacks the confirmation of the artificial marks used to designate the main westerly line; but the defendants claim, and their evidence tends to show, that rocks from the bank of the stream in this vicinity have been carried out by floods. We have seen that the lot as plotted has at its southwesterly corner a projection fourteen feet long by ten wide. The length of this projection is such that when the main westerly line of the lot is brought upon the margin of the stream the projection spans the gorge before described, bringing the end line of the projection on the outer rock. The witnesses are agreed that the lower line of the projection as surveyed crosses the gorge about where Crane's dam and gate were located. It may be that the lot can be located substantially as claimed by the orators, if the court is justified in rejecting the starting point as given—a question which is left for further consideration.

The Nicholses must be treated as obtaining a good title to the premises covered by their deed, for the parties claim from a common source. *Ames* v. *Beckley,* 48 Vt. 395. There is no evidence that they ever went upon the land, but they are to be treated as having received the possession with their deed. *Davenport* v. *Newton,* 71 Vt. 11, 42 Atl. 1087. There is no presumption that the mortgage note was paid at maturity, and under our holdings the legal title passes to the mortgagee on condition broken. But a mortgagee holds the title thus received only for the purpose of security, and the burden is on him and those claiming in his right to show anything done in enlargement of the title. There is no evidence that Wilkins or his grantees took possession under the mortgage within the statutory period, and it is only in support of an actual possession that the law will presume a conveyance or other relinquishment of the mortga-

gor's interest to the mortgagee. *Appleton* v. *Edson,* 8 Vt. 239;
*Brown* v. *Edson,* 23 Vt. 435, 450. The lapse of fifteen years
without payment or other recognition, and without an enforce-
ment of the security in any manner, will defeat the mortgagee's
right. *Whitney* v. *French,* 25 Vt. 663. Nor will the law of
abandonment avail the defendants. A failure to occupy land
for an indefinite time does not constitute an abandonment of title
or possession. 2 Wash. Real Prop. 453, 457. *Perkins* v. *Blood,*
36 Vt. 273, 283; *Langdon* v. *Templeton,* 66 Vt. 173, 180, 28 Atl.
866; *Davenport* v. *Newton,* 71 Vt. 11, 17, 42 Atl. 1087. The
water power covered by the deeds has not been lost by nonuser.
*Adams* v. *Barney,* 25 Vt. 225. It is generally said that real
property, corporeal or incorporeal, held by grant, cannot be lost
by abandonment. 1 Cyc. 6; note 40 Am. Dec. 466. But if the
law is otherwise, there can be no abandonment without an inten-
tion to abandon; *Moore* v. *Rollins,* 36 Cal. 333, 95 Am. Dec. 181;
*Dyer* v. *Sanford,* 9 Metc. 395, 43 Am. Dec. 399; and most author-
ities hold that this intention cannot be inferred from nonuser
alone. 1 Cyc. 5. But if not precluded by legal rule, we should
not draw the inference from an omission to use property of this
character. Nor will an abandonment be inferred from the
nonpayment of taxes. *May* v. *Riddle,* 25 Pa. St. 259; *Keene* v.
*Connovan,* 21 Cal. 291, 82 Am. Dec. 738; *Davis* v. *Perley,* 30 Cal.
630. We cannot find the fact of abandonment from the few in-
definite statements regarding the business and personal history
of the Nicholses. It is not necessary at this time to consider the
effect of a deed having but one witness. The deed to Soule was
properly executed on the part of Allen L. Nichols, and so con-
veyed an undivided half of the property. Defendants also claim
from the evidence that the changes in the process of manufac-
turing iron ware have been such that tub bellows are no longer
used, and contend that the power can be applied to nothing else.
It is not necessary to inquire as to the fact, for we construe the
words of the deed to be a measure of the power granted and not
a restriction of its use. So the orators have at least an un-
divided half of whatever land and power were conveyed by the
Wilkins deed, if the property can be located with sufficient cer-
tainty and has not been lost by adverse possession.

    If the lot lies where the orators have located it, it has not
been lost by adverse possession, actual or constructive. The man

who had charge of the adjacent property under Gaut put up two lengths of fence where they were sufficient in connection with a ledge to keep hogs on a small tract which included this parcel, and occupied the parcel in this manner from 1852 to 1862. The evidence does not carry the occupancy further, but if it did the continuance would be of no avail to the defendants, for the grant to the Nicholses was excepted from the conveyance to Gaut, and there is nothing in the evidence to indicate that this use was under a claim of right. There is no evidence of any other actual occupancy of the piece surveyed, except in connection with the water rights pertaining to the mills below. Nor can the occupancy of other parts of the grant avail here. The doctrine that the possession of any part will be considered a possession of the whole applies to possession under a deed which gives definite and certain boundaries. *Spaulding* v. *Warren,* 25 Vt. 316, 322. The defendants' title has already been stated. It originated in a deed of an undivided half of 28 acres of a certain original right. This language affords no certain indication that the 28 acres was all of the allotment, and if it was not all the description leaves the part conveyed undesignated. Nothing appears to show what the proprietors' records would have disclosed in this regard. The further statement that the 28 acres covers the grant on the river together with the water privileges and mills, is no more definite as regards boundaries. The only further element introduced by the deed of the remaining half is the fact that it was the whole of the lot on which the grantor resided. The grantee in the above deeds conveyed property deeded him by the grantor in 1832—a reference which would lead the inquirer to nothing if his inquiry was confined to that year. The next grantor used the same description by reference. The next returned by reference to the original description. The succeeding deed was of all the grantor's interest in the falls and land, without reference. The two subsequent conveyances were by references which led back to the first description. This brings us to Warner's deed to Gaut in 1852, and thus far no boundaries have been found sufficiently definite to support a claim of constructive possession. Warner's deed to Gaut was by metes and bounds, but the grant in question was excepted. Gaut's deed to Mrs. Minot in 1881 bounded the premises conveyed by the lands of certain persons named, and

described them further as all the lands and privileges he owned at the falls, but without referring to his deed. A description by a general reference to the lands of others cannot meet the requirement of definite and certain boundaries.

In reaching our conclusions of fact we consider all the evidence introduced by the defendants, and exclude from consideration the testimony of the orator E. A. Sowles, the objection to which is insisted upon.

We return to a further consideration of the description in the orators' deeds. The description as a whole is such that the change from "northeasterly" to "northwesterly" in the language which determines the starting point in the final deed of the series, is immaterial. The other variations from the first description may be treated as errors. So the courses are to be taken as found in the first deed. The expression "southerly or south," used in fixing a definite course so many degrees west, must be read "south," unless the course is controlled by an ascertained monument. If the direction governing the starting point is correct, the lot is located north of the Crane mill site. There is no patent obstacle in the way of this location. The reservation in favor of the Crane privilege does not necessarily require that the lot be located above the Crane mill. If a location north of the Crane property is accepted several things follow with certainty. The road described as leading to Crane's mill is the highway running past it. The lot lies wholly on the westerly side of the road. The entire length of its easterly line rests on the road. The northerly line of the lot is at a right angle with the road. The first and main line of the westerly side of the lot is S 30° W, and the lines forming the projection and southerly side of the lot are run by right angles from the end of that line. So the course of the southerly line of the lot is definitely determined by the course above given. This line, called fifty feet more or less, must be taken to be of the length stated, unless the distance is controlled by other calls. *Johnson* v. *Pannel,* 2 Wheat. 206, 4 Law. Ed. 221; *Cutts* v. *King,* 5 Me. 482; See *Blaney* v. *Rice,* 20 Pick. 62, 32 Am. Dec. 204. For present purposes this line may be assumed to strike the highway one rod north of the point represented on the orators' plan as the junction of the beaten path with the highway. Then if the southerly and westerly lines of the survey are run in reverse

order, the surveyor will be brought to the near vicinity of the points where the description locates the cross in the rock and the distinctive mark designated as the place of beginning—the letter N. An examination extending along narrow strips running through the places thus located in a direction parallel with the highway, will adapt the test to any north or south variation of the assumed starting point. It is to be presumed that a description of this character represents an actual survey. The case affords some indications that the rocks in this locality have remained undisturbed. The court would not be justified in disregarding the direction of the starting point as given in the deeds without some definite information concerning this location; and the case will be remanded for the taking of testimony covering a plotting of the survey on the highway north of the Crane mill site, a search for the designated marks on the lines above indicated, and distances, levels and other facts bearing upon the feasibility of the location for the use of power to be taken from the flume which supplied Crane's mill. There need be no inquiry upon the issue of adverse possession as applied to the territory described until the case upon the question of location is completed.

NOTE. This opinion was read at the January Term, 1909, and the case has since been held at the request of counsel, who now file a stipulation which provides for an affirmance of the decree, and a mandate in accordance therewith is sent down.