ENOS ADAMS *v.* LEONARD BARNEY AND SIDNEY SQUIRES.

*Riparian proprietors.    Their rights.*

Where the plaintiff, who had no right or title to the land to the west bank of the stream, or beyond the center of the channel, erected a dam across the stream, and upon the defendants' land, and so continued it for many years, and until the defendants removed the dam; *it was held,* that the erection of the dam partly upon the defendants' land, and thus diverting half of the water, was an injury for which the defendants might maintain an action, and therefore might lawfully remove the obstruction.

It is not necessary for one to appropriate the water of a stream to some special use, before he can complain of its diversion by another.

TRESPASS ON THE CASE, for diverting a stream of water running to the plaintiff's ochre factory.

Plea, not guilty, and trial by jury.

It appeared on the trial, that plaintiff, at the time of the injury complained of, was in the possession and occupation of certain ochre works, on the east side of the Furnace brook, in Bennington, and had been with others, for about thirteen years, under a

lease from one Solomon Morse, dated February 8, 1838; which leased the following described land: " all that tract of land, on the "farm where I now live, in Bennington, where the old scale-board "mill or machine formerly stood, giving the right to use all, or " any of the land within twenty-five rods of said old mill seat, for "the purpose of digging, carting, and drying, or manufacturing " ochre." The lessees were to pay fifty cents for each and every ton of ochre manufactured, also to take and use the water in a prudent manner, so that as little damage as may be, shall be done to the lands of the lessor ; and also, if the lessees shall neglect for the space of one year to manufacture ochre at any one time, the lessor to have the right to re-possess the premises.

That during the said thirteen years, the plaintiff and others interested with him in said business, had conducted the water of said brook to said works, by means of a dam across the channel of said brook, abutting on either bank, and turning the water through a flume, or artificial ditch, across the lands embraced in said lease, to said works, thence into said Furnace brook, below the lands claimed and occupied by the defendants; and that said dam was more than twenty-five rods distant from " the old mill seat," referred to in said lease.

It further appeared, that on the 26th day of April, 1808, Gov. Moses Robinson owned the land on both sides of, and across Furnace brook, where said dam is situated, and so down said brook, on both sides and across, at which date he executed to said Morse a deed of that date, of the following described land, as set forth in said deed : " Beginning at the southwest corner of the old furnace " lot, on the east side of the brook, thence southwardly down the " said brook to the northwest corner of the lot formerly owned by " Oliver Waters, thence eastwardly on the north line of the said " Waters' lot, to the west side of the highway, thence northwardly "on the west side of said highway, to the south line of the old "furnace lot, thence westwardly on the south line of said furnace " lot, to the first mentioned bound, supposed to contain eighteen " acres, be the same more or less."

It appeared that " the southeast corner of the old furnace lot," named in said deed, was on the east side of said brook, a few feet from the bank, and that the northwest corner of the Oliver Waters' lot, named in said deed, was on the eastern bank of said brook,

and that between those points, the brook and current of said brook curved westward, so that a straight line connecting those two points would not touch, or cut the east bank, of said brook.

It further appeared, that at the time of the injury complained of, the defendants were owners and possessors of the land adjoining on the west the said land conveyed by Moses Robinson to Solomon Morse, by said deed, from above said dam, down to said Oliver Waters' corner, by title derived from said Robinson.

It also further appeared, that on the 23d day of May, 1851, the defendants removed a portion of said dam, on the west half thereof, and west of the center line of said brook, and thereby diverted nearly all the water running to said ochre works, whereby the plaintiff's works were stopped, which is the injury complained of.

The plaintiff offered in evidence a deed from Enos Adams, Jr., to himself, dated in 1845, conveying his interest under the said lease to the plaintiff. Also a deed, from Isaac Morse to Solomon Morse, dated May 2d, 1844; and it appeared that from date, until the 20th day of May, 1851, said Solomon Morse, under said deed, had a joint interest in the business of manufacturing ochre, upon said leased premises, with the plaintiff, and at said last mentioned date, he conveyed all his interest in said premises, derived from said deed of Isaac Morse, and in said business, to the plaintiff.

The defendants offered in evidence a lease, from Solomon Morse to Samuel L. Godfrey, Jr., and Nelson Morse, dated April 22d, 1851, of the following described premises, as set forth in said lease: " Commencing at the southwest corner of a piece of land " owned by *Elhanan* W. Stratton, thence east twenty rods, thence " southwardly to lands heretofore leased by me to Enos Adams " and others, for ochre works, and now occupied by said Adams, " thence westwardly to a stream of water, called the old Furnace " brook, thence northwardly to the place of beginning; also the " right to erect such buildings and fixtures as they may wish to " erect, for the purpose of manufacturing yellow ochre," &c.

Also evidence, tending to prove that defendants, at the time of the injury complained of, were in possession of the premises described, digging ochre, under a contract of purchase, from said Godfrey and Nelson Morse, and that they, for the convenient prosecution of their business, were under the necessity of removing said dam.

It further appeared, that said Solomon Morse, soon after said deed from said Robinson to himself, in 1808, erected a dam across said stream, where the plaintiff's dam stands, and thereby conducted said water through a ditch to his scale-board works, upon the same site where plaintiff's ochre works stand, and continued said dam, and diversion of water, and businesss of manufacturing scale-boards, for twenty years, when said business was abandoned, the buildings removed, said ditch filled up, and said dam washed away, and so remained for ten years, when the plaintiff erected his dam, opened said ditch, and conveyed said water to his ochre works.

The defendants then introduced evidence, tending to prove that said Morse erected said dam and diverted said water, by the license and permission of the owners of the land adjoining, on the west of the land conveyed to him by the said Robinson, and that said claim was not adverse, and under claim of right.

The court charged the jury that the deed of Moses Robinson to Solomon Morse, conveyed to him all the land westward, to the center line of the main channel of the furnace brook, and that thereby he became the owner of one half of the water of said brook, and had a right to divert one half for his use, from the channel of the brook, and conduct it any where across his own land, although he did not restore it again to the channel of the brook, until it reached a point below said Oliver Waters' corner, and for that purpose had a right to place a sufficient obstruction across the stream, to turn his portion of the water, provided he does it without injury to the lands of others above.

That by the lease and deeds, from Solomon Morse and others, to the plaintiff, he had the right to take, from the land of Solomon Morse, the water to the ochre factory, erected on the site of the scale-board machine, and, if necessary, for the convenient use of such water at the factory, to get it at a greater distance than twenty-five rods from *the old mill seat;* and for the purpose of so doing, the plaintiff, as against the proprietors of the land on the west side of the brook, adjoining Morse's land, had all the rights of Solomon Morse, and such proprietors had no right to interrupt the plaintiff in the enjoyment of such rights, and that too, without reference to any right acquired by Solomon Morse, or the plaintiff, by an adverse use of fifteen years.

That the defendants, by virtue of the lease of Solomon Morse

to Godfrey and others, and their contract of purchase with said Godfrey and others, acquired no right to interfere with the plaintiff's use of the water, or to remove the dam.

. The' jury returned a verdict for the plaintiff.

To the several decisions of the court, the defendants excepted.

*Daniel Roberts* for defendants.

The County Court erred, in ruling that the plaintiff owned half of the water, and had a right to take that half away from its natural channel, and away from the defendants' land.

1. There is no ownership in running water, but a simple use of it, *as it passes along.* · The right of the riparian proprietor, being a right to use, it does not necessarily extend to the use of one half. He may use the whole, if such use works no injury to others ; he shall appropriate no part of it, if such appropriation works any sensible injury to others. If he diverts any portion of the stream, he must restore it to its natural channel, before it would in its natural course reach the proprietor below; since every proprietor has a right to have the water flow over his land, "in its natural current, without diminution or obstruction." *Wright* v. *Howard,* 1 Sim. & Stu. 190. *Tyler* v. *Wilkinson,* 4 Mason's (C. C.) R. 399.

Nor does this right depend upon whether "he may require the whole, or part of the water, for the use of machinery," for it is "a right which is as perfect and indefeasible as the right to the soil, and not depending upon the use." NELSON, J., in *Crooker* v. *Bragg,* 10 Wend. 266. *Davis* v. *Fuller,* 12 Vt. 178.

Thus it seems, that without proof of actual damage, or a previous appropriation of the water, an action lies in favor of the riparian owner for a diversion. Gale & Whateley's Easements, 171 and seq.

The defendants were proprietors below, of at least half the bed of the stream. The natural flow of the water over that half, was diminished one half, by the diversion of the plaintiff. The defendants' rights then stand upon the same ground, as though they had owned the whole bed of the stream, between the points of diversion from, and restoration to, the natural channel.

2. But the County Court went further, and held that the plaintiff had the right to maintain the west half of his dam, upon the.

defendants' land. In this, they erred. *Davis* v. *Fuller*, 12 Vt. 178. *Bliss* v. *Rice*, 17 Pick. 23.

*N. B. Hall, J. L. Stark, Jr., and A. B. Gardner,* for plaintiff.

The owner of lands, upon streams of water not navigable, owns to the center of the stream. And it makes no difference that certain monuments, on, or near the bank, are referred to, in the deed. There must be an express reservation, to exclude the stream.— *Exparte Jennings,* 6 Cowen, 542. *Lunt* v. *Holland,* 14 Mass. 149. *King* v. *King,* 7 Mass. 496. *Newton* v. *Eddy,* 23 Vt. 319. Edition of 1850, Angel on Water Courses, 12 *et passim.* Cases analogous to the one at bar may be found in 6 Cowen, p. 546, 547. 14 Mass. 149. 1 Hay, (N. C.) R. 237.

In reference to plaintiff's right to run his dam beyond the thread of the stream, so as to divert one half of the water for manufacturing purposes: The charge of the court below, subjects the rule to an important proviso, to wit: that it be done *without injury to the lands above the dam.*

This question has never been passed upon in this state, and may with propriety be termed an open question.

The control over these streams is exercised by the law; the court confers the title to the water, by construction of law; in doing this, the intention of parties is disregarded. *(See* Ang. on Water Courses, 12.) This rule of construction is not based on the intent, or grant of the party; but is founded in a wise and beneficial policy. It it not, therefore, so much a question whether the court is possessed of the power so to construe the grant, as it is an inquiry after the best manner of exercising that power, so as the most fully to answer the end of that policy upon which it is founded. 6 Cowen, pp. 548, 549.

By saying, that neither party shall use the water, as a motive power, without the consent of the other, and that where no injury follows, would render the most valuable property in the water useless. It would seem, that this result should be avoided, if it may be done without injury to those above, and this is all the County Court has done in the case at bar. Gale & What. on Eas. 90. 2 Hilliàrd, 102–104.

(There were many points raised and ably argued in the briefs,

Adams *v.* Barney et al.

which, as they were not passed upon by the court, are omitted.)

The opinion of the court was delivered by

REDFIELD, CH. J. This case has been twice argued, and as we have always been agreed, that, upon one point, the case must be opened, and as that will probably be decisive of the case, we think it best to dispose of it now.

It seems to be admitted, that in any view of the case, the plaintiff had no right or title to the land, certainly to the west bank of the stream, or beyond the center of the channel; but that he did erect his dam upon the defendants' land, and so continued it for many years, and that finally the defendants removed the dam which is the complaint, in this action.

It has been urged, that the charge of the court, justifying this diversion of half the water from the stream, by means of a dam, half of which rests upon defendants' land, if it caused no appreciable injury to them, is to be maintained in this country as needful for purposes of manufactures, in our altered circumstances. This would no doubt be very useful, and conducive, in many instances, to the public convenience. But, we find no sufficient basis upon which to rest any such determination. The land, beyond the middle of the stream, is confessedly the defendants'. The plaintiff had no right to use it, more or less, or to abridge either the defendants' present or prospective use of it. And no court or legislature has any power to give him any such right. It is not needful for one to appropriate the water of a stream to some special use, before he can complain of its diversion by another. If this were so, one having mill sites of ever so much value, might lose all beneficial use of them, and indeed the title, by long continued encroachments upon them, before he got ready to use them, which would establish what was formerly attempted to be maintained, at common law, an exclusive right to use the water, merely by prior occupancy, and in spite of the interest of others.

We think, therefore, the erection of the dam partly upon the defendants' land, and thus diverting half the water, was an injury of which the defendants might complain, and for which they might maintain an action. And if so, they might remove the obstruction. This may probably be decisive of the action.

In regard to the boundary defined in Moses Robinson's deed to

Solomon Morse, the court, which, for the hearing of this case, is composed of but two judges, is not well enough agreed to make any determination at the present time. There are three views susceptible of being taken in the case. 1st. That the stream is referred to, merely as indicating the direction of the line, and that the boundary is a right line between the monuments named. 2d. It may be the margin of the stream, which is intended to be made the boundary. 3d. This boundary, being upon the side of a fresh-water stream, not navigable, may, by construction, be extended to the thread of the stream, *ad medium filum aquæ.* And there is nothing at all decisive, in the decided cases upon this subject, either in this state, or elsewhere. All of these cases profess to go very much upon the same principle, and differ only in its application.— And here, it must be confessed, they often differ very widely. The case of *Buck* v. *Squires,* 22 Vt. 484, and a similar case decided at the same time, in the County of Chittenden, profess to steer evenly between the two extremes upon this subject, which it must be confessed are apparently somewhat wide apart. And although these cases may appear to some, as that of *Buck* v. *Squires* certainly did to me at the time, to have gone to the very extreme of excluding any portion of the stream, when it could fairly be done, without violence to the terms of the contract, it did not profess to go upon any such ground, and no case is authority except for what it professes to decide. And it is by no means certain, that another case, decided by the same court, should exhibit the same extreme tendency. For in the state of Mass., whose decisions the case of *Buck* v. *Squires* quoted with approbation, their courts have recently held, in *Knight* v. *Wilder,* 2 Cushing, 200, 209, that "where there is nothing in the conveyance to modify the rule, the side lines of each riparian proprietor must extend from the *termini* of his lines on the shore, at right angles with the course of the river, to the thread of the stream." This seems to me, all that any one could claim, in that direction. And if that is consistent with the rule laid down in *Tyler* v. *Hammond,* 1 Pick. 193, and in *O'Linda* v. *Lothrop,* 21 Pick. 292, and it does not profess to overrule those cases, then it could scarcely be claimed that any case, upon this subject, is very decisive of the particular construction of a contract, in another case upon the same subject matter. It is this very latitude of construction, and indefiniteness, which renders it

Adams *v.* Barney et al.

difficult, if not impossible, at the present time, to determine all the questions raised in this case. We think it advisable to open the case upon the first point, as possibly the others will not embarrass the case hereafter.

Judgment reversed, and case remanded.

ISHAM, J., having been counsel, did not sit in this case.