## NUNNELLY *v.* SOUTHERN IRON CO.

### (*Nashville.* February 9, 1895.)

1. STATUTE OF LIMITATIONS. *Filing plea on trial discretionary.*

   It is matter of discretion whether the Court will permit filing of plea of the statute of limitations after the trial has begun. (*Post, pp. 401, 402.*)

2. LICENSE. *Distinguished from easement—example.*

   The privilege to discharge water from ore washers into a stream, given without words of grant by a lower proprietor to an iron company as long as it "may wish to run, or have run," said washers, with an agreement to accept a certain sum as the full amount of damages done by such water, is a license personal to the licensee, not an easement, and does not pass to the grantees of such iron company. (*Post, pp. 408–412.*)

   Cases cited: 32 N. J. Eq., 254; 5 Wall., 599; 30 Am. Dec., 60; 27 Am. Dec., 675; 57 Am. Dec., 287; 2 Am. L. Cases, 506.

3. ESTOPPEL. *License does not create.*

   A mere license cannot operate to estop the licensor in favor of the licensee, because an estoppel must be mutual. (*Post, p. 412.*)

4. EASEMENT. *Contract creating is within statute of frauds.*

   An instrument creating an easement is within the operation of the statute of frauds, and must, therefore, contain a sufficient description of the premises in which the easement is granted. (*Post, p. 413.*)

5. CORPORATIONS. *Liability of officers for nuisances.*

   The president and general manager of a corporation are personally liable, with the corporation, for damages caused to a riparian proprietor by the long continued discharge of muddy water into a stream, from ore washers operated by the company

with their sanction and their knowledge of the damages caused thereby. (*Post, pp. 414-419.*)

Case cited: 54 Am. Rep., 231.

---

### FROM HICKMAN.

---

Appeal from Circuit Court of Hickman County. W. L. GRIGSBY, J.

PITTS & MEEKS for Nunnelly.

W. P. CLARK, STEGER, WASHINGTON & JACKSON, and JACOB LEECH for Southern Iron Co.

E. H. HATCHER, Sp. J. The plaintiff, W. S. Nunnelly, sued the defendants, the Southern Iron Company, the Warner Iron Company, J. C. Warner, and Percy Warner, in the Circuit Court of Hickman County for $5,000, as damages alleged to have resulted to the plaintiff by reason of certain nuisances alleged to have been maintained by the defendants. The declaration, and as amended, contains three several counts. In the first it is alleged that the defendants, for several years prior to the bringing of this suit, and at the time thereof, were operating, just east of and near to the premises of plaintiff, an establishment for mining iron ores, which are cleansed by means of certain machines, into which large quantities of water were conveyed through

pipes from Mill Creek; that the clay and dirt, thus separated from the ores, were carried off with the water in an artificial stream through the premises of plaintiff, near by and past his residence, storehouse, and springs, into Piney River, and thence on through said premises, polluting the waters of the river and of the springs, depositing large quantities of barren clay and mud in the bed of the river, filling up the fords thereof so as to render them impassable during the seasons of high water, preventing the customers of plaintiff from coming to his mercantile store, and thus damaging his trade; that when said river overflows its banks, this sterile dirt and clay are carried out and distributed over the alluvial lands of the plaintiff adjacent to the river, lessening its productiveness and otherwise injuring it; that the cattle of plaintiff were killed by getting mired up in this sticky deposit, and that the fish in said stream were destroyed by means of the flow of said waste matter therein, etc.

The second count seeks to recover for alleged damages resulting from defendants' operating alcohol works on Birds' Creek, near to and east of the farm of plaintiff, which creek flows across the southern end of said farm into Piney River, and from the waste materials and noxious odors from these alcohol works being discharged into said creek, and thence into Piney River, polluting these streams as well as his spring.

The third count seeks to recover for an alleged

nuisance of a similar kind, situated on Mill Creek,
which flows into Piney River north of and above
the farm of plaintiff, into which creek, as it is al-
leged, are discharged similar waste products and foul
odors from alcohol works on Mill Creek, which floats
these noxious materials and odors into Piney River,
through the premises of plaintiff; it being averred
that these alleged odors and waste products corrupted
the waters of Piney River, destroyed the fish therein,
and ruined plaintiff's spring.   To the declaration the
defendants jointly filed four pleas, the first being
the general issue, the second was one of accord and
satisfaction as of July 30, 1887, and the third of
an accord and satisfaction as of February 25, 1887,
by the Standard Charcoal Company, which, it was
averred, operated as an easement, and that this ease-
ment was assigned by the Standard Charcoal Com-
pany to The Warner Iron Company.   The fourth
plea sets up an estoppel by virtue of a certain writ-
ten instrument, executed by the plaintiff on the
thirtieth day of July, 1887, the tenor of which will
be noticed hereafter.   Issue was joined upon the
first, second, and third pleas, but the fourth plea
was demurred to by plaintiff for the reasons which
will be discussed later on.   His Honor, the Circuit.
Judge, sustained this demurrer and ordered this
fourth plea to be stricken out.   The Warner Com-
pany and the Southern Iron Company each filed an
additional separate plea.   That of the Warner Com-
pany avers that L. H. Nunnelly, plaintiff's ancestor,

in December, 1880, leased to one Goodrich, for a period of sixteen years, the ore banks described in the declaration, for the purpose both of mining and of washing ores, and that on the nineteenth day of February, 1884, said L. H. Nunnelly signed a written permission to flow mud, water, and dirt through his lands in question; that Goodrich conveyed this lease to the Warner Iron Company before this suit; that since the execution of said lease, plaintiff inherited said premises by the death of said L. H. Nunnelly, and that, on July 30, 1887, plaintiff, by written instrument, gave to the Warner Company the right to flow muddy water from the washing of said ores, which written instrument, it is averred, was to be in full satisfaction of all damages complained of in the declaration.

The additional or fifth plea of the Southern Iron Company alleges that, on December 26, 1889, G. M. Fogg and others, as trustees of the Warner Iron Company, sold to the Southern Iron Company all of its property, franchises, easements, licenses, and contract rights in Hickman County, among which was the written agreement referred to in the foregoing plea of the Warner Iron Company, and that this contract was executed as full satisfaction of the injuries complained of.

There was replication to these two pleas and issue thereon. The cause was heard by the Circuit Judge without the intervention of a jury, and after examination of plaintiff as a witness had begun,

26—10 p

and more than sixteen months after the filing of the first four pleas, counsel for defendants presented a sworn plea of the statute of limitations of three years, and in an affidavit assigned his reasons for not sooner presenting said plea. Upon objection from plaintiff's counsel, the Circuit Judge declined to permit this plea to be filed, because no sufficient excuse was given for the delay, to which action of His Honor defendant's counsel excepted.

The record discloses the following undisputed facts: The plaintiff is the owner of a valuable farm of about 1,800 acres in Hickman County, which he cultivates, and on which he has a mercantile store, and through which farm flow three streams—Piney River, Tanyard Branch, and Bird's Creek. Piney River flows through the entire width of this farm, from north to south; Tanyard Branch and Bird's Creek are both tributary to Piney River from the east, and flow through a portion of this farm, the former through the northern or upper, and the latter through the southern or lower part thereof. On the farm, and near these streams, are several valuable springs of clear, pure water. Plaintiff and his sister jointly inherited this farm upon the death of their father, L. H. Nunnelly, and plaintiff bought his sister's interest therein. In 1880, L. H. Nunnelly, plaintiff's father, leased to one Goodrich fifty acres of this farm lying on the east margin thereof, and near to Tanyard Branch, for the purpose of mining iron ore and other minerals therefrom, with

the exclusive right of so doing for a period of six-teen years. This lease was signed by the plaintiff also, and was duly registered. The consideration for the lease was that the lessor was to receive one tenth of the ores and minerals taken from the land, or the cost of mining and delivering same at the shaft in shipping condition. Goodrich transferred this lease to the Warner Iron Company, who began min-ing operation about 1882 or 1883. The Warner Iron Company owned lands adjoining this fifty acre tract thus leased from plaintiff's father, and most of the iron ore mined came from about ten acres of this land belonging to said company.

At first, the ores were separated from the clay and dirt by screens and sieves, and these waste ma-terials were not carried off; but about 1884 the Warner Iron Company laid pipes, by means of which water was conveyed from Mill Creek to these mines, a distance of about one and a half miles. Washing machines were then put up on the lands of the Warner Iron Company, into which the ores were placed, and then separated from the dirt and clay by the water from said pipes. This water, after thus washing the ores, was discharged, with the mud and clay, into Tanyard Branch, from whence it flowed through plaintiff's premises into Piney River, and on down the river through said premises. Tan-yard Branch is the only natural outlet by which this muddy water and waste materials can be flowed from these mines at Nunnelly ore banks. The muddy

water, dirt, and clay, which were carried from the washing machines, caused heavy deposits of mud and sticky clay to settle in the beds of the branch and river, and, in seasons of high water, when the streams overflowed their banks, this mud and clay were washed out and over upon the adjacent alluvial land of plaintiff, and deposited thereon, as well as upon the road leading through his farm, by means of which road some of his customers usually came to his store to trade. Plaintiff's stock frequently mired up in this sticky deposit on his lands, and some of said stock were thus lost, though the value thereof is not shown. Some of this muddy water and waste matter inundated his springs. After the Warner Iron Company had thus operated its washing machines from five to seven years, said company erected dams across the hollow near said machines, which dams intercepted the mud and clay washed from the ores, and thus permitted only clear water to flow through plaintiff's premises. As long as these dams were kept in good repair, no injury was caused from the washing of the ores.

The Warner Iron Company owned and operated certain alcohol works on Mill Creek, for the manufacture of wood alcohol. Mill Creek flows into Piney River about two miles north of and above said farm of plaintiff. The waste matter and disagreeable odors from these alcohol works were discharged into Mill Creek, which carried them into Piney River, and through said farm, impregnating the waters of the

river and spring of plaintiff with said odors and waste products.

In 1881, the Standard Charcoal Company, not sued herein, erected similar alcohol works on Bird's Creek, just east of and above plaintiff's farm, from which works similar waste products and odors were discharged into said creek, which floated them along the creek and into Piney River, through plaintiff's farm, and impregnated these streams and a spring on said farm with said odors and waste matter. In the latter pnrt of 1888, the Standard Charcoal Company sold these last named alcohol works to the Warner Iron Company, which latter company operated them until December, 1889, at which time the Warner Iron Company conveyed all of its property, franchises, licenses, easements, etc., in Hickman County to G. M. Fogg et al., trustees, which trustees sold the same in January, 1890, to the Southern Iron Company. There is considerable conflict in the proof as to the effect of the waste matter and deposits upon the waters of the streams and springs, and upon the fertility of the soil, and whether the fish in the streams were or not driven therefrom by the discharge from the ore washers and alcohol works; and, in fact, there was conflict in the proof as to nearly every element of alleged damage.

His Honor, the Circuit Judge, after hearing the evidence, rendered judgment in favor of plaintiff and against the two defendant corporations, as follows: That the Warner Iron Company, by reason of the

flow of the refuse and offensive matter down Bird's Creek, and into plaintiff's spring, drinking and stock water, is liable to him in the sum of $100, and in the further sum of $500 as damages caused to plaintiff by the deposit of red mud upon his bottom lands. His Honor further adjudged that the Southern Iron Company was liable to plaintiff in the sum of $1,000 as damages resulting from the deposit of mud from the washers upon plaintiff's bottom lands, and in the fords of the creek. He held that the proof failed to show that J. C. and Percy Warner were active participants in the nuisances in such a manner as to render them personally liable, and he therefore dismissed the suit as to them. He further held that the various written instruments plead and relied on by defendants as defenses to this suit were mere licenses, which could afford no protection to the transferees thereof, but expired at the several dates of their respective transfers. The plaintiff and defendants both appealed in error, and both parties have assigned errors.

Passing by the probably improper joinder of the two defendant corporations for torts which the proof disclosed to be separate and independent of each other, such supposed misjoinder not being raised by counsel, we pass to the consideration of the questions raised by the pleadings and the assignments of errors.

The verdict of the Circuit Judge is abundantly sustained by the evidence, in so far as the amount of damages awarded is concerned; and, under the

rule of this Court, the judgment will not be disturbed unless there be some error in the record. The filing of the plea of the statute of limitations by defendant was in the sound discretion of the Circuit Judge, and the record fails to show that this discretion was improperly exercised. It was therefore not error to refuse to permit this plea to be filed.

The plaintiff was permitted to testify, over objection of defendants' counsel, as to his estimate of the value of the fishing privilege to his farm. Even if this were error, it was entirely harmless, for the reason that the damage to the fishing privilege formed no part of the recovery against defendants.

To the question urged with so much earnestness and ability by counsel for defendants, that there was an easement of necessity to flow these waste materials from the mining products growing out of the original lease, and out of the fact that Tanyard Branch was the only natural outlet by which these waste materials could be flowed from the mines, it is sufficient to say that neither the pleadings nor the assignment of errors raise this question. Besides, it is in proof, and undisputed, that when the lease was executed, and for a year or two thereafter, the dirt and waste materials were not separated from the ores by the washing or hydraulic process, but by means of screens and sieves, and the waste was then left on the grounds. His Honor might, therefore, have been warranted in the conclu-

sion that the parties did not contemplate the necessity
of flowing these waste materials through the premises
in question at the time the lease was executed.

Counsel for defendants insist, also, in argument,
upon an equitable estoppel, created, as they insist,
by the conduct of plaintiff and his ancestor in en-
couraging a large expenditure of money in the erec-
tion of the plant, and laying of pipes to convey
water with which to wash the ores.    But, as before
stated, there is evidence, undisputed, tending to show
that the parties did not contemplate, at the time of
the lease, that the ores would be separated from the
dirt and clay by means of water, which would have
to flow through said natural outlet; nor is there any
proof whatever that plaintiff, or his ancestor, ever
encouraged, directly or indirectly, the investment of
money in providing means by which to cleanse the
ores by the washing or hydraulic process.    Nor, in-
deed, do either the pleadings or the assignment of
errors rely upon such an equitable estoppel.

This brings us to the remaining and vital ques-
tions involved in this lawsuit:

1. Were the several written instruments plead and
relied on by defendants mere licenses, personal to the
licensees, and not assignable, but revoked or expired
when transferred by the licensees?    Or did they create
such essential and permanent rights as to be in the
nature of easements running with the realty, and as-
signable  so  as  to  operate  as  a  protection  to  the
assignees  thereof?

2. Did the several instruments offered in evidence sustain the pleas of accord and satisfaction?

3. Are J. C. and Percy Warner liable in this action?

The distinction between an easement and a license is often so metaphysical, subtle, and shadowy as to elude analysis. As said by the Vice Chancellor, in *East Jersey Iron Co.* v. *Wright*, 32 N. J. Eq. Rep., p. 254: "The adjudications upon this subject are numerous and discordant. Taken in their aggregate, they cannot be reconciled; and, if an attempt should be made to arrange them into harmonious groups, some of them would be found to be so eccentric in their application of legal principles, as well as in their logical deductions, as to be impossible of classification." But there are certain fundamental principles underlying most of the cases, which enable Courts to distinguish an easement from a license, when construed, as all instruments must be, in the light of surrounding circumstances. Mr. Washburn defines a license as "an authority to do a particular act, or series of acts, upon another's land, without possessing any estate therein." He defines an easement as follows: "An easement implies an interest in the land, which can only be created by writing, or, constructively, its equivalent—prescription. A license may be created by parol. * * * It matters not whether the license be oral or in writing, in respect to its being parol, if the paper giving it have no requisites of a grant."

1 · Washburn on Real Property, *9, 398. Again he says: "So long as a license is executory, it may be revoked at the pleasure of the licensor." To the same effect are Washburn on Easements and Servitudes, p. 6; *De Haro* v. *United States*, 5 Wall., 599; 3 Kent's Com., p. *453; Gould on Waters, Secs. 322, 323; 1 Warvelle on Vendors, pp. 43, 44; 1 Sugden on Vendors, p. 177.

The discussion of licenses, in a large number of the cases and authorities, grows out of licenses created by parol. Some of them hold such licenses to be revocable, even when a consideration is paid therefor; otherwise, it is said, they would defeat the operation of the statute of frauds. See *Mumford* v. *Whitney*, 30 Am. Dec., 60; *Prince* v. *Case*, 27 Am. Dec., 675; *Cowles* v. *Kidder*, 57 Am. Dec., 287. But there are other cases which hold that even parol licenses, without consideration, are not revocable when executed; and some of these authorities go to the extent of holding that such executed licenses are assignable. All of such authorities as hold such licenses irrevocable and assignable, treat them as in the nature of equitable estoppels. See the extensive notes to *Rerick* v. *Kern*, 2 Am. L. Cases, 506, where the subject is exhaustively treated.

It is universal, however, both upon principle and authority, that it requires words of grant to create an easement or a permanent interest in realty; and it is equally obvious that, in construing instruments of all kinds, the object of the Court should be to

ascertain the purpose and meaning of the parties thereto.

With the above definitions and principles in view, let us examine the written instruments relied upon by defendants to defeat this action. All of them were properly acknowledged and duly registered. The first is the one executed July 30, 1887, by the plaintiff alone, and is relied upon in defendant's fourth plea as an estoppel, and it is copied in full in the plea. It recites that, for the sum of $500, "I, W. S. Nunnelly, have bargained and agreed, and do hereby bind myself, to allow the Warner Iron Company to pass the muddy water from their washers at Nunnelly ore banks by and through my farm and premises as long as said Warner Iron Com-- pany may wish to run, or have run, said washers. I further agree and bind myself to accept $500 as full amount of damages done or that may hereafter be done, except in the case of a large spring at lower end of said Nunnelly's farm should be dam- aged by the settlings of, and mud from, said wash- ers, then said Warner Iron Company agree and bind themselves to remedy such damages by building a stone or brick wall, so as to protect said spring from the settlings of mud from the washers. It is further agreed by the Warner Iron Company that if any of Nunnelly's stock should get mired in the mud settlings on the river or sloughs passing through Nunnelly's farm, and should be a loss to him, then the Warner Iron Company is to be responsible for

such loss. It is fully agreed and understood that the above $500 is for damages to the branch that passes my farm, and not for damage done in the river, except the above named damage."

This plea was demurred to because the instrument relied on was insufficient as an estoppel, because it shows upon its face that it applies to the damages in the branch, and not to Piney River, and does not protect the assignees or the other defendants. The Court sustained this demurrer, and, we think, properly.

The instrument contains no words of grant, and, by the express terms thereof, it is limited to the Warner Iron Company only so long as said company shall run or have run the washers in question; so that, by the very terms of the instrument, the license would terminate whenever the Warner Iron Company placed it beyond its power to further operate these washers, or to have them operated. Nor could this instrument operate as an estoppel. It is a cardinal principle of the law of estoppels that they must be mutual to be effective for any purpose. 2 Herman on Estoppel, Secs. 793 and 889. At Section 772 it is said: "The rule requiring reciprocity in cases of estoppel necessarily requires that a lease shall be by indenture, and not by deed poll; for both the lessor and lessee must be bound, or neither." See also the cases cited in 2 Milliken's Digest, 1348. Nor do we think that the damages which were paid for, as recited in this in-

strument, covered or referred to those sued for in the declaration, and therefore did not operate as an accord and satisfaction thereof, as relied upon in the third and fifth pleas.

Counsel for defendants earnestly insist that this instrument created an easement. In this view we cannot concur. An easement is an interest in land —an incorporeal interest, it is true, but an interest, nevertheless—and is within the operation of the statute of frauds. 3 King's Tenn. Digest (2d Ed.), p. 1848, Sec. 27, and cases cited. There is no description whatever in this instrument of any realty; not even the State or county of its location is given, no metes or bounds or limits.

The next instrument relied upon by defendants to defeat this action is, also, one set up in the fifth plea of the Warner Iron Company, to wit: the one executed by L. H. Nunnelly, on February 19, 1884. This instrument was signed by L. H. Nunnelly alone, and stipulated that, for certain considerations, the Warner Iron Company was to have a water way for flowing off the mud, etc., through Nunnelly's lands, and provides for arriving at the measure of any damage to his land by arbitration. This instrument, although called, in the fifth plea, "a written permission to flow muddy water and dirt" through Nunnelly's land, yet, by a fair construction of the whole plea, it sufficiently relies upon this instrument as conferring an easement to the Warner Iron Company to flow the muddy water and dirt through Nunnelly's farm. But

it is ineffectual as a bar to this suit, for several reasons: as a conveyance of an easement in realty, it contains no description whatever of the land upon which the easement is to be fastened; as an agreement to submit to arbitration the measure of damages, it is not sufficient, for the reason that it does not bind the Warner Iron Company, nor was it relied upon in the pleadings for this latter purpose.

We are of opinion that the instrument of February 25, 1877, executed by W. S. Nunnelly to the Standard Charcoal Company, is sufficient to create an easement. It locates the realty as being in Hickman County, Tenn., adjacent to the works of the Standard Charcoal Company. It identifies the easement granted by limiting it to the channel of Bird's Creek. It contains express words of grant, and grants the easement "for all future time," and is supported by a valuable consideration. This instrument was relied on in the third plea as an accord and satisfaction, and, also, as an easement passing by transfer from the Standard Charcoal Company to the Southern Iron Company, and is, we think, a sufficient bar to any recovery for the injuries resulting from the alcohol works on Bird's Creek, and which injuries the Circuit Judge found to amount to $100.

The Circuit Judge held that defendants, J. C. and Percy Warner, were not active personal participants in the nuisances so as to make them personally liable. The only proof in the record as to the connection of these defendants with the wrongs com-

plained of, is to be found in the testimony of plaintiff and J. B. Thompson, a witness called by plaintiff. Plaintiff testified that J. C. Warner was president of the Warner Iron Company, and also of the Southern Iron Company for a short while after the latter company had purchased the properties of the former company. Mr. Thompson also testified that J. C. Warner was ·the president of the Warner Iron Company; and the plaintiff understood that J. C. Warner was a director and one of the largest stockholders of the Southern Iron Company. He testified that Percy Warner was the general manager of both companies; that he was frequently at the washer plant at Nunnelly ore banks, and took an active part in the operation of said washer. He further testified that both J. C. and Percy Warner—father and son—knew these works were going on, and that he, the plaintiff, frequently talked with both of them about these works, and urged them to put in the dams before they were in fact put in, and offered to give, without charge, the privilege of erecting them across the hollow on his land, if they would put them in and stop the flow of mud onto his farm. It was also in proof, as already shown, that these washers were operated from five to seven years before any dams were built, and that the dams, when built and in repair, prevented the mud and waste products from flowing down upon plaintiff's farm. J. B. Thompson, on cross-examination, says: "The Warners

only acted as officers. I never knew them to do anything as individuals.''

When a person enters into a contract with a corporation, through its agents or officers, fairly and in good faith, there can, under no circumstances, any liability attach to such agents or officers in respect to the contract, unless so stipulated. In such a case, the person gets just what he bargained for, a liability against, or a contract with the corporation alone. But the torts or wrongs of corporations, through its agents or officers, are governed by an entirely different principle of law. If the agent of a corporation, or of an individual, commits a tort, the agent is clearly liable for the same; and it matters not what liability may attach to the principal for the tort, the agent must respond in damages if called upon to do so. This principle is absolutely without exception—is founded upon the soundest legal analogies and the wisest public policy. It is sanctioned by both reason and justice, and commends itself to every enlightened conscience. To permit an agent of a corporation, in carrying on its business, to inflict wrong and injuries upon others, and then shield himself from liability behind his vicarious character, would often both sanction and encourage the perpetration of flagrant and wanton injuries by agents of insolvent and irresponsible corporations. It would serve to stimulate the zeal of responsible and solvent agents of irresponsible and insolvent corporations in their efforts to repair the

shattered fortunes of their failing principals upon the ruins of the rights of others.    Says Mr. Morawetz: "The agents of a corporation are clearly liable for their tortious acts; they are therefore liable for any injury to the property of others, * * * and the liability is entirely independent of any liability which the company may have incurred." 1 Morawetz on Corporations, Sec. 569.

To the same effect is 1 Waterman on Corporations, p. 415, where it is said: "The directors of a gas company were held liable for a nuisance created by the superintendent and engineer under a general authority to manage the works, though they were personally ignorant of the particular plan adopted, and, though such plan was a departure from the original and understood method, which the directors had no reason to suppose had been discontinued."

In Wood on Nuisances, Sec. 824, it is said: "If the nuisance complained of is created by a corporation, the corporation and such of its officers as have the direction and control of its business, as well as its agents or servants who contributed to the nuisance, may be jointly sued or indicted therefor." It will be seen that this author predicates the liability of the officers who have the direction and control of its business, upon the presumption alone that such officers know of and sanction the nuisance; whereas, the liability of the inferior agents or servants is founded upon their participation in the acts creating the nuisance.    See, also, 1 Beach on Pri-

27—10 p

vate Cor., Sec. 266; Thompson on Liability of Offi-
cers and Agents, pp. 351, 355; Mechem on Agency,
Sec. 182; *Peck* v. *Cooper*, 54 Am. Rep., 231.

The proof is uncontradicted that J. C. and Percy
Warner, the president and general manager of these
defendant companies, knew of the operation of these
works. One of them took an active part in the
operation of the washer at Nunnelly's. Plaintiff
talked to these gentlemen frequently about the mat-
ter, and urged them to put in dams to protect his
property from the flow of these noxious deposits.
In examining the question of the liability of J. C.
and Percy Warner, we do not find a case of a
single and isolated act of negligence or misfeasance.
The rights of this plaintiff were continuously ignored
for years. We cannot doubt, from the proof in
this record, that both these gentlemen knew for a
long time that the operation of these works was
continually causing injury to plaintiff's property, and
that for years they permitted this injury to go on
without any effort to provide means to avoid it. It
is true, Mr. Thompson says they acted only as
officers, and not as individuals. This was but the
mere statement of a legal conclusion; and, even if
it were literally true, it would not serve to protect
them from liability for torts committed · by them as
such officers. The Court is, therefore, of opinion
that there is no evidence in the record to sustain
the finding of His Honor, the Circuit Judge, in
favor of the defendants, J. C. and Percy Warner.

The Court, therefore, holds that these gentlemen are liable to the plaintiff, jointly with the Warner Iron Company, for the sum of $500 in respect to the damages awarded by His Honor, the Circuit Judge, against the Warner Iron Company, for the deposit of mud upon plaintiff's bottom lands, and that they are liable, jointly with the Southern Iron Company, in the sum of $1,000 in respect to the damages awarded against the Southern Iron Company.