C. H. & H. J. Davenport *vs.* Moses Newton, et al.

October Term, 1898.

Present: Ross, C. J., Taft, Rowell, Tyler, Start, and Thompson, JJ.*

Opinion filed November 7, 1898.

*Tax Title.*—A purchaser of land at a tax sale acquires no title nor color of title unless the sale is followed by a deed from the collector.

*Constructive Possession.*—One's possession is not to be extended by construction beyond the limits of his deed; but the presumption is that he has claimed in accordance with his deed.

*Adverse Possession.*—Although occupation is a fact, the effect of it, when its nature and character appear, is a matter of law. Therefore, in order to set the statute of limitations in operation, it must be such in fact that in law it works a disseisin of the owner, and to have that effect, it must possess all the elements of adverse possession. But even

---

*Note by Rowell, J. This case was first argued at the January term, 1898, before all the judges but *Munson*, J., who was engaged in county court. It was further argued at this term on the last two points, which were not touched upon before, all the judges being present but *Tyler* and *Start*, JJ., who were engaged in county court; but *Tyler, Munson* and *Start*, JJ., concur in the whole opinion.

an occupation not such as to ripen into title against the owner may be good as against strangers.

*Possession by Wrongdoer.*—Even a tortfeaser may maintain trespass against a stranger who disturbs his possession.

*Possession, an Estate.*—A possession under color of title, though not of such a character as to ripen into title against the true owner, is an estate, and may pass by deed.

*Abandonment.*—If one receiving such an estate by deed omit all acts of possession for a long series of years, such omission will not of itself, as matter of law, constitute an abandonment, for abandonment is a question of fact.

*Constructive Occupation.*—If one have separate deeds of lots A and B, acquired from different sources at different times, his actual occupation of A will not amount to constructive occupation of B.

*Province of Referee.*—It was within the province of the referee to find that a letter which the defendants claimed was an acceptance of the offer contained in a letter from one of the plaintiffs, was in fact only a memorandum of a contract to be afterwards formally drawn up.

*Acceptance.*—An acceptance must conform exactly to the terms of the offer.

*Director's Liability.*—To make a director of a corporation personally liable for its acts, he must have done something that makes them his acts also; the mere fact that he is one of a board of directors is not enough.

*Nonsuit.*—The history of the right to enter a non suit or nol. pros. reviewed.

*Nonsuit Permitted.*—Treating the question as matter of discretion at this stage of the case, without considering whether it would be matter of right at some other stage, the court permits the plaintiffs to enter a nonsuit as to one of the defendants, as otherwise the plaintiffs will lose a substantial part of their damages by lapse of time, such released defendant not being liable for the whole amount, and the plaintiffs not being considered at fault in failing to sooner discover the fact.

*Treble Damages.*—The plaintiffs, who by reason of their actual possession are entitled to maintain trespass against the defendants as mere strangers to the title, are nevertheless not entitled to treble damages under the statute, being themselves only trespassers as against the real owner, for whose benefit, not theirs, the statute was enacted.

TRESPASS on the freehold, with a claim for treble damages under R. L. 4206. Pleas, the general issue and two special pleas. Upon the report of a referee at the December term, 1896, Bennington county, *Thompson*, J., presiding, judgment was rendered, *pro forma*, for the defendants to recover their costs. The plaintiffs excepted.

A stipulation was filed to the effect that a *pro-forma* judgment might be rendered for the defendants upon

condition that no claim which the plaintiffs might have urged before the county court, either for treble damages or otherwise, should be waived or prejudiced.

*Waterman, Martin & Hitt* for the plaintiffs.

*Charles S. Chase* and *J. K. Batchelder* for the defendants.

ROWELL, J. This is trespass on the treble-damage act for cutting timber-trees on land in Searsburg. The *locus* consists of that part of lot No. 53 that lies west of the old town line, called the Ball Lot; the rest of 53, except a strip

SEARSBURG

| 45 | 44 | 43 | 42 |
|---|---|---|---|
| Old Town Line | Ball Lot | 57-rod Strip | |
| 52 | 53 | 54 Governor's R. in parallel lines | 55 |
| 61 | 60 | 59 | 58 |
| New Town Line | | | |

NORTH

WILMINGTON

on the north end that belongs to the Governor's Right; and of that part of lot No. 54 that lies west of said old line, called the 57-rod strip.

The plaintiffs claim title by adverse possession only; and failing that, they claim a possessory title sufficient to enable them to maintain trespass against the defendants, who are strangers to all title.

The defendants concede the cutting, but deny that the plaintiffs have either title or possession; but if they have, leave and license from them is claimed.

The first deed of the Ball Lot is a warranty deed from Origin Ball to Ebenezer Stone, dated August 28, 1834, which describes the land as bounded south by lands owned by

Cassander Flagg, formerly owned by Benoni Davis; east by Wilmington west line; north and west by lots and lands unknown; containing fifty acres, and known by the name of the Ball Lot.

Ebenezer Stone deeded the same to Amos Wentworth on July 1, 1836, and Wentworth deeded it to Ashley Stone, with other lands, on February 15, 1838; and both deeds contain substantially the same description as Ball's deed to Ebenezer Stone.

On May 10, 1839, the whole of lot 53 was sold to Ashley Stone for taxes, and the whole of 54, to Walter Goodnow. The collector deeded to Goodnow on May 9, 1840, describing the land as "lot No. 54, in the second division, drawn to the original right of John Williams, estimated to contain 164 acres;" but it does not appear that he ever deeded 53 to Ashley Stone nor to any one else.

On June 10, 1841, Goodnow quitclaimed 54 to said Stone, describing it as it was described in the collector's deed to him.

On February 27, 1845, said Stone gave to Ezra T. Butterfield a warranty deed of the Ball Lot and of the whole of 54, describing the Ball Lot as bounded south by the Flagg Lot, so called; east by lands the owner of which was unknown; north by lot 54, second division according to the Searsburg survey; and west by lands of Solomon Rich; containing by estimation fifty acres, and known by the name of the Ball Lot; and describing lot 54 by its number and division, according to said survey and plan of Searsburg, being the same theretofore deeded to the grantor by Walter Goodnow, as would appear of record; and on the same day Stone quitclaimed to Butterfield the rest of 53 not included in the Ball Lot, according to the original survey and plan of Searsburg, estimated to contain a hundred acres. Butterfield, therefore, had deeds of the whole of 53 and 54; and on September 8, 1847, he gave to Horatio B. Smith and A. D. Smith a warranty deed of the

Ball Lot and of lot 54, describing them as they were described in his deed from Stone, and on the same day he quitclaimed to said Smiths the rest of 53 according to the original survey and plan of Searsburg, estimated to contain a hundred acres; and so the Smiths had deeds of the whole of 53 and 54.

On March 8, 1861, Emily S. Smith, widow of Horatio B. Smith, and executrix of his will, which was duly probated, deeded to Charles N. Davenport, Eleazer Gorham, and A. L. Wilder, lots 53 and 54 according to the survey and plan of the town, intending thereby to convey all the lands in Searsburg of which her husband died seized and possessed, and all the lands conveyed to him and A. D. Smith by said Butterfield as aforesaid or otherwise; and on June 10, 1861, Wilder quitclaimed said lots to Davenport, and Gorham quitclaimed them to him November 15, 1861, both referring to Mrs. Smith's deed for description. So Davenport had deeds of both of said lots, but it does not appear that A. D. Smith ever deeded them to any one.

On September 5, 1839, Cassander Flagg deeded to Anna Flagg fifty acres, more or less, of that part of lot 52 lying between the old town line and lot 45, and on October 13, 1841, she deeded the same to Ashley Stone. We suppose this to be the land on which Stone lived when he occupied the Ball Lot as below stated.

On March 27, 1877, said Davenport deeded to Hermon Holt, administrator of the estate of David H. Sumner, all of lot 59, that part of 54 lying east of the old town line, and that part of 53 and 60 that is included in the Governor's Right.

Said Davenport died April 12, 1882, and the plaintiffs are his heirs and claim as such, and it is conceded that they have whatever right and title he had to the *locus* when he died.

Ashley Stone's bidding off 53 at the tax sale of 1839 gave him no title nor color of title, as the sale was not followed

by a deed from the collector, *Langdon* v. *Templeton*, 66 Vt. 173, and as it does not appear that he ever occupied any part of it except the Ball Lot, his occupancy thereof must be confined to that lot; and his possession of that cannot be extended by construction to the rest of 53, for the presumption is that he was claiming only according to his deed, which covered only the Ball Lot. It is found that he claimed to own the Ball Lot, and occupied it some seven years, living meantime on lot 52 south of and adjoining it. These were probably the years during which he had a deed of it, namely, from 1828 to 1845. But the nature and character of that occupancy do not appear, unless we assume what is not found, that he cleared the whole or a part of the lot, as it appears that it was cleared before Davenport bought it in 1861, but when or by whom does not appear; hence it is claimed that Stone's possession of the lot does not appear to have been such as would ripen into title against the owner, and that therefore it is not available to the plaintiffs here. Although occupation is a fact, the effect of it, when its nature and character appear, is matter of law. *Child* v. *Kingsbury*, 46 Vt. 47. Therefore in order to set the statute in operation, it must be such in fact that in law it worked a disseisin of the owner, and to have that effect it must possess all the elements of adverse possession, so that it will ripen into title in the requisite time. Stone's occupancy does not appear to have been such, as there is nothing to show its character except that it was under claim and color of title, which is not enough. But it is not necessary that it should have been such as to ripen into title against the owner in order to be good against strangers, for possession may be good against one man and not against another. If there is a tortious possession not amounting to a disseisin, the constructive possession as between the tort-feasor and the one having the legal title is deemed to continue in him who has the right; but the tort-feasor may, nevertheless, maintain

trespass against a stranger who disturbs his possession, and the stranger cannot defend by saying that the tort-feasor's possession is the possession of the true owner, for being a stranger, he is not connected with the title of the owner. *Langdon* v. *Templeton.*

Now Stone's possession of the Ball Lot, though not amounting to disseisin, was good against strangers, and he could have maintained trespass against them for disturbing his possession, for he had a deed of the lot and was in occupancy of the whole of it, as we construe the report, and claimed ownership under color of title, and that possession was an estate, and passed by deed from Stone to Butterfield. And although it does not appear that Butterfield did any act upon the lot during the two years and a half that he held a deed of it, yet if he did not, that fact does not of itself and as matter of law constitute an abandonment of the possession he acquired from Stone, for whether a prior possession has been abandoned or not is a question of fact, to be determined from the circumstances of the case, and there is no finding of abandonment here. *Langdon* v. *Templeton,* above cited; *Patchin* v. *Stroud,* 28 Vt. 394. Hence it must be held, in view of the character of the land, that at the time Butterfield deeded to the Smiths in 1847, he was still in possession of the lot—*Langdon* v. *Templeton*—and that his possession passed to the Smiths by his deed to them, the same as Stone's possession passed to him. And although it does not appear that the Smiths ever did any act upon the lot during the about fourteen years they held a deed of it, yet, as there is no finding of abandonment by them, it must be held that they or their legal representatives were in possession when Mrs. Smith deeded to Davenport, Gorham and Wilder, and that her deed transferred that possession to them, or at least the possession of her testator, so that they had possession under claim and color of title; and it is clear from the facts found that Davenport, who soon bought out Gorham and

Wilder, not only did not abandon that possession, but supplemented it by an entry of his own, claiming title, for in 1864 or 1865 he caused a fence to be built between the lot and Boyd's on the south, with the declared purpose of pasturing horses there, and it is found that he did pasture horses there, though on inadmissible testimony, we think, and he occasionally went upon 53 and 54, and had a local agent to look after his lands there, and always paid taxes on them.

But as to 54 and the rest of 53, it does not appear that any of those under whom Davenport claimed ever had actual possession of either, nor that Stone ever had constructive possession, for his possession of the Ball Lot did not extend by construction to the rest of 53, for the reason above stated; nor did it extend to 54, for although he had color of title of it, as his deed from Goodnow described it by number and division, naming the original proprietor, and it fairly appears from the report that the town was allotted, or at least that portion of it in which these lots are located, yet his deed was obtained from a different source and at another time.

Nor did Butterfield nor the Smiths have constructive possession of that part of 53 not constituting the Ball Lot, as they held that by a separate deed, though obtained from the same source and at the same time. Whether by obtaining possession of the Ball Lot as they did they thereby acquired constructive possession of 54, upon which they never entered, it is unnecessary to inquire, for Davenport acquired possession of both 53 and 54 by his entry on the Ball Lot, which was a part of 53, as his deed embraced both lots; and as the Ball Lot was a part of 53, his entry upon that, claiming all that his deed covered, as he did, gave him, in contemplation of law, possession of all—*Webb* v. *Richardson*, 42 Vt. 465—and that possession was sufficient to have enabled him to maintain trespass against one entering without right upon any part of the

lots. *Green* v. *Pettingill*, 47 N. H. 375: 93 Am. Dec. 444, and note.

But it does not appear that his entry and possession were such as to make them adverse to the owner, for the fence between the Ball Lot and Boyd's, the building of which was the most hostile act shown, no more indicated that it was for the purpose of occupying the Ball Lot than Boyd's lot, and so it was no notice to the owner of the former of an adverse possession of it. But his possessory title descended to the plaintiffs; and while it does not appear that they have done anything upon or concerning the lots except to run the lines, pay the taxes, and redeem them from two tax sales, this shows that they have not abandoned possession, but have kept up their claim of title, and therefore their possession of the entire *locus*, though not adverse to the owner, is good against the defendants; but they concede that they cannot recover against Daniel H. Newton, for it does not appear that he had anything to do with the cutting. Moses Newton, John C. Newton, and Willard Sumner are the only other defendants, as The Deerfield River Company, a corporation against which the writ runs, was never served with process.

The plaintiffs also claim that the statute makes their title to 54 good against the defendants. It provides that when lands have been listed to a grantee in a collector's deed, duly recorded, or to his grantees, for a period of twenty years or more, and taxes paid thereon by said grantee or grantees, the title to said lands shall be legal and valid in the person claiming under such conveyance, against every person who subsequently enters upon such lands without having any legal right thereto. V. S. 491. But we do not decide this. In *Downer* v. *Tarbell*, 61 Vt. at page 533, it is said that the validity of that act is questionable. We express no opinion about it, as it would not, if the claim is sustained, give the plaintiffs the fee, but only such title as they have without it.

The defendants claim that the referee exceeded his province in finding that there was no contract between the plaintiffs and said company, giving the defendants a right to cut, for that the letters that passed between them made a contract as matter of law. But we think the finding must stand, for the referee finds that the plaintiff, C. H. Davenport, was justified in considering and treating the company's letter to him, which the defendants claim was an acceptance of the offer contained in his letter to Sumner, the company's agent, as a memorandum of a contract to be formally drawn up, as suggested in his letter, when his brother, who was better informed in such matters, could consider the correspondence and the conditions of the bargain when the papers were ready for consideration and signing by both parties; and that neither the company nor John C. Newton, who signed it as treasurer, supposed it would close the contract without something further. This finding was within the province of the referee, and warrants the finding that the minds of the parties never met.

There is another ground on which it is clear that there was no contract. C. H. Davenport's letter to Sumner offered to sell "the lumber at one dollar per thousand, in the way and on the condition indicated when you were here," referring to a conversation they had had about the matter, which, it is found, "looked to the taking of all the timber upon the lands claimed by the plaintiffs, whether the titles were in controversy or not." The company's reply accepted the offer as to price, for the spruce and fir on 53 and 54 and on twenty-five acres of lot 51, which were not all the lands claimed by the plaintiffs, but did not refer to disputed titles, and said that the logs were to be cut and delivered according to the specifications of a contract with Sumner for a period of two years, and that payments would be made between the 15th and the 25th of each month for all stumpage, according to the log scale of the previous month, measured according to Scribner's old log rule. The

plaintiffs knew nothing about the contract with Sumner, which was of the same date as the company's letter, and provided for cutting only spruce and fir on 53 and 54 and said twenty-five acres, to be cut into logs twelve feet and four inches long for twelve feet, and to scale not less than eight inches in diameter at the top. All this, except the price, either fell short of or went beyond the things indicated in the conversation referred to in Davenport's . letter, and so the company's letter was no acceptance; for an acceptance, to be good, must be such as to conclude a contract between the parties, and to do that, it must in every respect meet and correspond with the offer, neither falling short of nor going beyond the terms proposed, but exactly meeting them at all points and closing with them just as they stand. *Potts* v. *Whitehead*, 23 N. J. Eq. 512. An acceptance on terms varying from those proposed is, in effect, a counter proposal, and is not binding until it is itself accepted. Benjamin's Principles of Contracts, 13. And such counter proposal is a rejection of the offer, and puts an end to the negotiations, unless the party who made the original offer renews it or assents to the modification suggested. The other party, having once rejected the offer, cannot afterwards revive it by tendering an acceptance of it. *Minneapolis, etc., Railway Co.* v. *Columbus Rolling Mill*, 119 U. S. 149; *National Bank* v. *Hall*, 101 U. S. 43; Benjamin's Principles of Contracts, 13.

The cutting complained of began October 1, 1888, and ended March 21, 1890. It appears that on October 1, 1889, The Deerfield River Company, of which all the Newtons were directors and Moses and John were managers, sold some of its mills, timber lands, and whatever right it had or claimed to have to cut timber on the lands in question, to The National Metal-Edge Box Company, a corporation of which Moses and John were also directors, and that thereafter John had nothing to do personally with reference to said lands nor the cutting of timber thereon,

but that Moses had charge of the Box Company's business of cutting timber in this State. On these facts the claim that John is not liable for the cutting done after the River Company sold out is well founded, for to make a director of a corporation personally liable for its torts, he must have done something that makes them his torts also; the mere fact that he is one of a board of directors is not enough, and here nothing more appears.

*Fanning* v. *Osborne*, 102 N. Y. 441, is much in point. There, a partnership, of which the defendant Osborne was a member, maintained and operated a street railroad for a time, and then became incorporated, and the corporation succeeded to the business of the firm. Osborne managed the road under the firm, and was president of the corporation, but it did not appear that he did any act in respect of the road after the corporation took it, nor that he advised or approved the corporation's acts, and for that reason it was held that he was not liable for damage done by the corporation in operating the road. The law of this subject is pretty fully discussed in *Nunnelly* v. *Southern Iron Co.*, 94 Tenn. 397: 28 L. R. A. 421 and note. It is said in a monograph note on this subject in 48 Am. St. Rep. at page 922, that the only question of which there can be any serious doubt in this class of cases is, whether the officer or agent has participated in the wrong so that it may justly be regarded as his act; that if he has, his liability is indisputable.

This being so, the plaintiffs ask leave to become non suit as to John, that they may take judgment against the other defendants for the full amount, as they are liable for the whole time; and if such leave is not grantable, they ask leave to enter a retraxit or a remittitur as to John; and if not entitled to that, they ask that judgment be entered for him and against the others. To all this the defendants object for divers reasons, and one is, that if judgment passes against Moses Newton and Sumner only up to the time the

River Company sold out all after that is outlawed, so that they could not be made liable therefor in another action, and hence should not be in this by letting John out.

At the common law a nonsuit, in strictness, could be entered only at the instance of the defendant. 2 Tidd Pr. [*868]; *Arnold* v. *Johnson*, 1 Str. 267. Lord Coke says that a nonsuit is ever upon demand made when the plaintiff ought to appear but does not. 1 Co. Litt. [138b]. A *nol pros.* is, in effect, like a nonsuit, and is the same as in modern practice is the dismissal of an action for want of prosecution. By 14 George II. c. 17, s. 1, judgment as in case of a nonsuit could be rendered against the plaintiff in some cases although he appeared. In *Dow* v. *Hinesburgh*, 2 Aik. 18, 26, judgment for the defendants "as upon a nonsuit" was rendered in the supreme court on motion of the plaintiff and after verdict against him. The court said that the general rule is that a nonsuit shall not be entered after verdict, but that, for the furtherance of justice, the court will sometimes permit it. In *Squires* v. *Burgess*, 31 Vt. 466, the plaintiff entered a nonsuit below, and the defendant moved to strike it off, which was denied, and he excepted. This court said that the whole matter of allowing a suit to be stopped without any judgment except that the plaintiff go out of court with his claim, and of vacating such entries, rests in the discretion of the court in which the case is pending. We have not adhered strictly to the common-law idea of a nonsuit, but allow a plaintiff to become nonsuit on his own motion, and indeed at certain stages of the case he may become nonsuit as matter of right, as was held in Caledonia county many years ago, we are told.

By the common-law nonsuit the plaintiff goes out of court as to all the defendants, the same as he does by a *nol pros.*, and therefore when he desires to go out of court only as to some of the defendants or as to a part of his declaration, a *nol. pros.* is probably the most apt way of

doing it, though we are little accustomed to that in civil cases.

It is said by Mr. Sarjeant Williams in his note to *Salmon* v. *Smith*, 1 Saund. at page 207, and what he says is approved and adopted by the supreme court of the United States in *Minor* v. *The Mechanics' Bank of Alexandria*, 1 Peters 46, 74, that the nature and effect of a *nolle prosequi* in civil cases were not accurately ascertained and defined till modern times, and that the old authorities are contradictory and confused upon the subject; that in some of them it was considered as a retraxit, operating to release or discharge the action, and an absolute bar to another action for the same cause, and that therefore in trespass against two who pleaded several pleas, it was held that if the plaintiff entered a *nol. pros.* against one before he obtained judgment against the other, it would defeat the action as to both, but that in other cases, which have been adhered to ever since, a *nol. pros.* is considered not to be of the nature of a retraxit, but only an agreement not to proceed either against some of the defendants or as to some part of the suit, and that it may be entered as to one defendant before judgment against the other, notwithstanding the former cases. In Minor's case, above cited, Judge *Story* defines a *nol. pros.* in a civil case to be a "partial forbearance by the plaintiff to proceed further as to some of the defendants or as to some part of the suit, but still he is at liberty to go on as to the rest." And both he and Mr. Serjeant Williams say that in cases of tort against several, though they all join in the same plea and are found jointly guilty, yet the plaintiff may after verdict enter a *nol. pros.* as to some and take judgment against the rest; and the reason is, that as such actions are joint and several, the plaintiff might originally have sued one and obtained judgment and execution against him alone, and therefore he may, after verdict against several, elect to take his damages against any of them. Judge *Story* further says that it does not seem to have been denied that cases in tort

might arise in which, if the defendants severed in their pleas, the plaintiff might, after judgment against one, enter a *nol. pros.* as to the others; but that the doubt was, whether he could do that before judgment, which was finally settled in favor of the right, and that after that, when several damages in actions of tort were assessed against different defendants, the difficulty was cured by entering a *nol. pros.* as to all the defendants but one. As we have seen, it makes no difference in this respect whether the defendants join or sever in their pleas.

Minor's case was debt on a joint and several bond. The sureties severed from the principal in their pleas, and judgment was given against them before the principal appeared. After he appeared and pleaded severally, a *nol. pros.* was entered as to him, and the question was whether that was error for which the judgment against the others should be reversed, and held no error. The court said that the authorities, and particularly the American, proceed upon the ground that the question of entering a *nol. pros.* is matter of practice, to be decided upon considerations of policy and convenience rather than matter of absolute principle, and that therefore the court was left at full liberty to make such a decision as its own notions of general convenience and legal analogies would lead it to adopt; and it was of opinion that where the defendants sever in their pleadings, a *nol. pros.* ought to be allowed, as it is a practice that violates no rule of pleading, and would generally subserve the public convenience, and that in the administration of the law, matters of form not absolutely subjected to authority may well yield to the purposes of justice. Mr. Dane says in the 5th volume of his abridgment at page 676, that if the plaintiff enters a *nol. pros.* it is his own free act, and that the only question is, when will the court permit him to do it?

Treating this question as matter of discretion at this stage of the case, without considering whether it would be

matter of right at some other stage, we think that justice will be helped on by allowing a *nol. pros.* or a nonsuit—and it makes very little practical difference which it is called—to be entered as to the defendant John C. Newton; and all the more, because otherwise the plaintiffs will lose a substantial part of their damages by lapse of time, for which it does not appear that they are to blame; nor does it appear that they were culpably negligent in not sooner finding out that John was not liable for all the trespasses, for he was so connected with both companies and their business that it might have been hard to tell whether he was liable for all or not.

The plaintiffs claim treble damages. The statute provides that "if a person cuts down, destroys or carries away trees placed or growing for use, shade or ornament, or timber, wood or underwood, standing, lying, or growing on the land of another person, without leave from the owner of such lands," * * * "the party injured" may recover of such person treble damages in an action on the statute; and the question is, whether the plaintiff, in order to recover treble damages under this part of the statute, must be the owner of the land, or whether possession under claim and color of title is enough. This statute does not create the right of action, but only gives cumulative damages for what was and still is actionable at common law. *Montgomery* v. *Edwards*, 45 Vt. 75. It was first passed in 1787, when the action was given to "the party injured or trespassed upon." Sts. of 1787, p. 160. In the Sts. of 1797, p. 187, the words, "or trespassed upon," were omitted, and they have never been restored. The revision of 1839 imposed a fine for wilfully and maliciously cutting trees on the lands of private persons, and repealed the treble damage act. R. S. c. 95, § 23, and c. 111, § 12, p. 516. But in 1849 it was reenacted in substantially the same language that it is in now. Acts 1849, No. 12.

When we consider the object of the statute, which is, as declared by the Act of 1787, "to punish trespasses in divers cases," and by the Act of 1797, "more effectually to prevent" them, it seems clear that the purpose is to protect the owner of the land, and not a trespasser upon him, though having a possession good against a stranger, for such a trespasser would himself be under the ban of the statute if he committd the acts therein specified. And the language of the statute imports this, for the prohibition is, "without leave from the owner of such lands." This means a leave good against the owner, and he alone can give that. If the possessor as distinguished from the owner was meant, the language should have been, "the owner or possessor." But as the possessor is not named, we infer he is not intended. This precludes the idea that the "party injured" may be other than the owner of the land, for, in a just sense, no one can be injured but the owner. But whether the plaintiff must be owner in fee in order to recover under the statute, or whether one claiming under such owner can recover, it is unnecessary to decide, for these plaintiffs are neither, but are trespassers as to such owner, as they have not disseised him, though they have possession good against a stranger, and are in under claim and color of title. Such plaintiffs are not the party injured, within the meaning of the statute, and therefore cannot recover treble damages. In Illinois, the word "owner" in a statute similar to ours in its general provisions, has been repeatedly held to mean the owner of the fee. *Jarrot* v. *Vaughn*, 7 Ill. 132; *Abney* v. *Austin*, 6 Ill. App. 49. A similar statute in Michigan has received the same construction. *Achey* v. *Hull*, 7 Mich. 423. In Mississippi it is held that as the cutting of trees is an injury to the freehold, the plaintiff claiming the statutory penalty must be the real or apparent owner of the freehold, but that possession under claim and color of title will ordinarily be sufficient. *McCleary* v. *Anthony*, 54 Miss. 708.

If the omission of the words, "or trespassed upon," from Sts. of 1797, is to be given any effect, it makes in favor of the construction we adopt.

> *Judgment affirmed as to Daniel H. Newton, but reversed as to the other defendants, and judgment of nolle prosequi as to John C. Newton, with costs, and judgment against Moses Newton and Willard Sumner for $760.16, that being the value of all the timber cut as found by the referee, with interest thereon by way of damages from March 21, 1890, the end of the cutting, to the first day of this term.*